Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
TAVENNER & BERAN, PLC
20 North 8th Street, Second Floor
Richmond, Virginia 23219
(804) 783-8300
Proposed Attorneys for the
Debtor in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

--------------------------------------------------------x
In re                                      :        Chapter 11
                                           :
S & K Famous Brands, Inc.,                 :        Case No. 09-30805 (KRH)
                                           :
               Debtor.                     :
--------------------------------------------------------x

**MOTION OF THE DEBTOR: (I) FOR ENTRY OF AN ORDER APPROVING
BIDDING PROCEDURES AND PAYMENT OF BREAK-UP FEE IN CONNECTION
WITH AGENCY AGREEMENT FOR PROPOSED STORE CLOSING SALES AND
GRANTING CERTAIN RELATED RELIEF AND (II) FOR ENTRY OF AN ORDER
PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, AND 503 AND
BANKRUPTCY RULES 2002, 6003, 6004, AND 9007 AUTHORIZING DEBTOR TO
ENTER INTO AGENCY AGREEMENT IN CONNECTION WITH PROPOSED STORE
CLOSING SALES AND GRANTING CERTAIN RELATED RELIEF**

The debtor in possession in the above-captioned case (the "Debtor")[1] hereby moves (the

"Motion") this Court for entry of orders: (a) approving certain proposed bidding procedures for

the purpose of obtaining higher and better bids for an agency agreement in connection with a

proposed closing of certain of the Debtor's stores, including the Debtor's payment of a "stalking

horse" break-up fee in the amount of fifty thousand dollars ($50,000.00) to Gordon Brothers

Retail Partners, LLC, and (b) authorizing the Debtor to enter into a proposed agency agreement

in connection with a proposed closing of certain of the Debtor's stores, and granting certain

---

[1]  The Debtor is S & K Famous Brands, Inc., and the last four digits of its taxpayer identification number are 5694.

related relief. In support of the Motion, the Debtor incorporates by reference in the Declaration of Richard H. Hardy, Jr., Vice President of Finance and Information Technology of S&K Famous Brands, Inc., filed on February 8, 2009 (Docket No. 14). In addition, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this case and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105, 363, and 503 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6003, 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

3.      On February 9, 2009 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtor continues to manage and operate its business as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108.

5.      No trustee or examiner has been appointed in this chapter 11 case.

6.      On February 11, 2009, the Office of the United States Trustee filed a Notice of Appointment of Official Committee of Unsecured Creditors (Docket No. 66), which listed the members of the Official Committee of Unsecured Creditors (the "Committee").

## RELIEF REQUESTED

7.      By this Motion, the Debtor requests this Court to approve the Debtor's entry into an agency agreement in connection with the proposed closing of certain of the Debtor's stores (as described herein, the "Store Closing Sales Agreement"). In furtherance of this requested

relief, the Debtor requests this Court to enter two (2) orders (collectively, the "Proposed Orders").

The first order (the "Bidding Procedures Order") approves the bid procedures specified herein

(collectively, the "Bidding Procedures") to aid the Debtor in obtaining higher and/or better bids

for the Store Closing Sales Agreement, including the Debtor's potential payment of a break-up

fee in the amount of fifty thousand dollars ($50,000.00) to Gordon Brothers Retail Partners, LLC

("GBRP"). The second order (the "Sale Order") approves the Debtor's entry into a Store

Closing Sales Agreement with the Winning Bidder (as that term is defined in the Bidding

Procedures), and authorizes the Winning Bidder to conduct sales at the locations in the Store

Closing Sales Agreement, notwithstanding any contrary Restrictive Provision in either a

Restrictive Document or a Liquidation Sale Law (all as defined herein).

## **BASIS FOF RELIEF**

**A.      The Store Closing Sales Agreement**

8.      Before the Petition Date, the Debtor undertook efforts to cut costs, streamline

operations, and increase profitability. To that end, like many retail businesses, the Debtor

determined that it was necessary to close certain underperforming or otherwise unprofitable retail

stores. Accordingly, from August 8, 2008 through January 31, 2009, the Debtor retained certain

professionals to conduct store closing sales at seventy-eight (78) stores, reducing the Debtor's

total store count as of the Petition Date to one hundred thirty-six (136) stores.

9.      The Debtor has concluded in its business judgment that it is in the best interest of

the Debtor and its bankruptcy estate to close an additional thirty (30) stores (collectively, the

"Proposed Store Closing Sales"). To this end, the Debtor sought to contract with an established

liquidator to conduct the Proposed Store Closing Sales on terms favorable to the Debtor. To that

end, the Debtor has actively sought out and engaged in discussions with numerous liquidators

with national and regional reputations for conducting such sales (collectively, the "Potential Store Closing Agents").

10.     After vigorous, good faith, arm's length negotiations, the Debtor has finalized a proposed Store Closing Sales Agreement with GBRP, a copy of which is attached as <u>Exhibit A</u> to this Motion (the "GBRP Agreement"). The Debtor's lender, Wells Fargo Retail Finance, LLC ("Wells Fargo"), has approved and is party to the GBRP Agreement. The Debtor has determined that moving forward expeditiously towards consummating the GBRP Agreement, subject to a limited opportunity for the other Potential Store Closing Agents to submit "higher and/or better" offers for the Proposed Store Closing Sales in accordance with the Bidding Procedures, is imperative to maximizing proceeds to the Debtor from the Proposed Store Closings and thus maximizing value to the Debtor's estate.

11.     Due to anticipated future appraisals and potential reductions in inventory, the Debtor has determined that the inventory in the stores subject to the Proposed Store Closing Sales will lose substantial value unless the Proposed Store Closing Sales can begin by no later than February 19, 2009.

**B.      The Bidding Procedures**

12.     In order to maximize value to the Debtor's estate, the Debtor proposes to afford other Potential Store Closing Agents with a limited opportunity to submit "higher and/or better" bids in accordance with the following procedures (collectively, the "Bidding Procedures"):

      a.     On February 13, 2009, the Debtor shall serve a copy of the Motion on the Potential Store Closing Agents;

      b.     By February 18, 2009 at 9:30 a.m. Eastern Standard Time (the "Bid Deadline"), all Potential Store Closing Agents other than GBRP shall submit electronically any competing proposals to the Debtor's proposed bankruptcy counsel at ltavenner@tb-lawfirm.com (each a "Competing Bid").

c.    After the Bid Deadline, the Debtor shall review each Competing Bid to determine whether, in the Debtor's business judgment, the Competing Bid constitutes a Qualified Bid.  In order to constitute a Qualifying Bid, the Debtor, in its business judgment must determine that the Competing Bid satisfies the following criteria: (i) the Competing Bid must agree to be bound by all of the terms and conditions of the GRBP Agreement except as modified as to price and other economic terms; (ii) the Competing Bidder must provide adequate assurance of their ability to perform their obligations pursuant to any bid; and (iii) the initial overbid by any Competing Bidders must be for a Guaranteed Amount at least in excess of the amount of the Break-Up Fee.

d.    By February 18, 2009 at noon, the Debtor shall file with the Court a notice indicating all Qualified Bids received by the Debtor by the Bid Deadline, and whether the Debtor intends to conduct an auction.

e.    On February 18, 2009 at 2:00 p.m., the Debtor will request the Court to hear the Motion pursuant to one of the following two (2) schedules:

(i)  In the event Competing Bids are submitted, the Debtor will request the Court to enter the Bidding Procedures Order authorizing the Debtor pay a break-up fee to GBRP in the amount of fifty thousand dollars ($50,000.00) (the "Break-Up Fee"), from proceeds of the sale if an entity other than GBRP wins the Auction (as defined herein).  If the Court agrees to enter the Bidding Procedures Order, then the Debtor will hold an auction immediately thereafter at the offices of Tavenner & Beran, P.C., 20 North 8th Street, Second Floor, Richmond, Virginia 23219 (the "Auction").  GBRP and Potential Store Closing Agents submitting Qualified Bids (each, a "Bidder") each must have an authorized representative present, in person or by phone, at the Auction.  The Auction will continue until the Debtor, in consultation with the Committee, has determined which Bidder has submitted the "highest and best" bid (the "Winning Bidder").  The Debtor will then seek an immediate hearing before the Court to approve entry of an order approving the Debtor's entry into an agreement with the Winning Bidder for the Proposed Store Closing Sales.

(ii) In the event no Competing Bids are submitted, then GBRP shall become the Winning Bidder, and the Debtor will request the Court to enter both the Bidding Procedures Order and a Proposed Order approving the Debtor's entry into GBRP Agreement.

13.    The proposed Bidding Procedures carefully balance the Debtor's interest in

inducing GBRP to commit to consummate a Proposed Sale Agreement, while preserving the

opportunity to continue to attract higher and/or better offers from other Potential Store Closing Agents. The Debtor concludes that the proposed Bidding Procedures are fair and reasonable under the circumstances of this chapter 11 case and are reasonably calculated to induce all interested parties to submit competing bids, thereby ensuring maximum value is recovered for the Debtor's estate.

## APPLICABLE AUTHORITY

**A.      Authorization to Enter into the Store Closing Sale Agreement Is Appropriate.**

14.      Bankruptcy Code section 363(b)(1) provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." A sale of a debtor's assets should be authorized pursuant to Bankruptcy Code section 363(b) if a sound business purpose exists for the sale. See In re Delaware & Hudson Rwy. Co., 124 B.R. 169, 176 (D. Del. 1991); In re W.A. Mallory Co., Inc., 214 B.R. 834 (Bankr. E.D. Va. 1997); In re WBQ P'ship, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995); see also Stephens Indus., Inc. v. McClung, 789 F.2d 386. 390 (6th Cir. 1986); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983). The test of whether a sound business purpose exists is comprised of four elements. A trustee or debtor-in-possession must show that:

(a)      a sound business reason or emergency justifies the sale;

(b)      adequate and reasonable notice of the sale was provided to interested parties;

(c)      the sale has been proposed in good faith; and

(d)      the purchase price is fair and reasonable.

See WBQ P'ship, 189 B.R. at 102 (citing Delaware & Hudson Rwy. Co., 124 B.R. at 176).

15.     The Debtor concludes that the Proposed Store Closing Sales reflect the exercise of its sound business judgment and a proper exercise of its fiduciary duties.  A sound business purpose exists for consummating the Proposed Store Closing Sales immediately and outside of a plan of reorganization; namely, the proceeds of the Proposed Store Closing Sales represent the maximization of the value of the stores which are the subject of the Proposed Store Closing Sales. The Debtor concludes that any delay in consummating the Proposed Store Closing Sales could substantially reduce the proceeds available for the Debtor's estate.

16.     Thus, the Debtor concludes that approval of the relief requested in this Motion and the proposed sale to the Winning Bidder is in the best interests of the Debtor and its estate, and should, therefore, be approved.

**B.      The Bidding Procedures Should Be Approved.**

17.     The proposed Bidding Procedures will assist the Debtor in maximizing the return for its assets by providing for a potentially competitive auction and inducing GBRP to enter into the GBRP Agreement and thereby provide a "floor" for the Proposed Store Closing Sales.

18.     Bid protections such as the proposed Break-Up Fee are of substantial benefit to the Debtor and its estate.  See e.g., Official Committee of Subordinated Bondholders v. Integrated Resources. Inc. (In re Integrated Resources. Inc.), 147 B.R. 650, 660 (S.D.N.Y. 1992) Bid incentives such as the Break-Up Fee encourage potential purchasers to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor (or in this case a prospective debtor) despite the inherent risks and uncertainties of the chapter 11 process. See e.g., In re 995 Fifth Ave. Assocs. L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations

omitted); In re Marrose Corp., Case Nos. 89 B 12171–12179- CB, 1992 WL 33848 at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) (stating that "[a]greements to provide . . . reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

19.     Bid protections take many different forms, including paying the out-of-pocket expenses incurred by a bidder in arranging the deal, including the due diligence expenses, or compensating a bidder for its lost opportunity costs. See In re Hupp Indus. Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992).

20.     In this case, assuming the Debtor meets the minimum inventory requirements, the GBRP Agreement represents a guaranteed recovery of not less than $1,944,000.00 for the estate. Thus, the Break-Up Fee in the amount of $50,000.00 (representing approximately 2.6% of $1,944,000.00) falls below the range of fees that have been approved by courts in this District and others. See, e.g., In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 536 (3d Cir. 1999) (noting that a combined break-up fee and expense reimbursement totaling approximately 4% to 5% of purchase price was "within the range of fees approved by some courts"); In re Chesapeake Corp., et al., Case No. 08-36642-DOT (Bankr. E.D. Va. Jan. 20, 2009) (Santoro, J.) (approving a 4.6% break-up fee and expense reimbursement); In re Ameriserve Food Distribution, Inc., Case No. 00-00358-PJW (Bankr. D. Del. Jan. 31, 2000) ( allowing a 3.6% break-up fee); In re HHL Financial Servs., Inc., Case No. 97-398-SLR (D. Del. Mar. 31, 1997) (approving break-up fees from 5.5% to 5.9%). The Debtor asserts that the Break-Up Fee is appropriate under the circumstances of this case, will pose little or no barrier to other seriously interested parties who want to enter into a Store Closing Sales Agreement, and will create a competitive auction environment.

21.     Well-settled case law established that courts should consider three factors in determining whether to approve bid protections:

(a)     whether the relationship of the parties is tainted by self-dealing or manipulation;

(b)     whether the protections hamper, rather than encourage, bidding; and

(c)     whether the amount of the fee is unreasonable in relation to the proposed transaction price.

Integrated Resources, 147 B.R. at 657.

22.     Each of these factors weighs in favor of approving the Break-Up Fee to GBRP. First, GBRP is a third party which engaged in arms' length negotiations with the Debtor, and thus is not an insider or otherwise tainted by self-dealing. Second, the Break-Up Fee will not hamper bidding as it is a small portion of the anticipated purchase price. Third, the proposed Break-Up Fee is reasonable in relation to the purchase price, i.e., the proposed Break-Up Fee is not excessive compared to the fees and reimbursements approved in other cases and will not diminish the Debtor's estate. Instead, the Break-Up Fee enables the Debtor to assure a sale to a contractually committed bidder at a price which is fair and reasonable, while providing the Debtor with the opportunity of obtaining even greater benefits for the estate through the auction process.

23.     Accordingly, the Debtor concludes that the Bidding Procedures will not chill bidding, are reasonable, and their approval will enable the Debtor to maximize the value of its estate. Therefore, the Bidding Procedures should be approved.

**C.    The Court Should Invalidate any Restrictive Provisions in Restrictive Documents or Certain Federal, State, and Local Laws, Statutes, Rules and Ordinances that May Impair the Debtor's Ability to Conduct Store Closing Sales.**

24.    In addition, the Debtor respectfully submits that the Proposed Store Closing Sales should be free from various restrictions that would impair such sales, including both provisions of such leases or other documents (collectively, the "Restrictive Documents") purporting to restrict or prohibit the Debtor from conducting store closing, going out of business, inventory liquidation, or similar sales (collectively, the "Anti-Alienation Provisions"), and state and local statutes and regulations regarding bulk sale restrictions, augmentation limitations that would otherwise apply to a Store Closing Sale, and consumer fraud laws, with the exception of deceptive advertising laws (collectively, the "Liquidation Sale Laws") (collectively, the Anti-Alienation Provisions and the Liquidation Sale Laws are the "Restrictive Provisions").

25.    Store closing or liquidation sales, such as the sales described herein, are a routine part of chapter 11 cases involving retail debtors. Such sales are consistently approved by courts, despite provisions of recorded documents or agreements purporting to forbid such sales in the ordinary course of business. Indeed, Anti-Alienation Provisions in leases have been deemed unenforceable in other chapter 11 cases as impermissible restraints on a debtor's ability to maximize the value of its assets under Bankruptcy Code section 363. See In re R.H. Macy & Co., 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994); In re Ames Dep't Stores, Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (finding that "to enforce the anti-GOB sale clause of the [l]ease would contravene overriding federal policy requiring Debtors to maximize estate assets by imposing additional constraints never envisioned by Congress"); see also In re Tobago Bay Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding anti-going-out-of-business sales clause in lease unenforceable); In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (same).

Thus, the Debtor requests this Court to enter an order stating that the Restrictive Documents shall not be permitted to interfere with, or otherwise restrict the Debtor or its designee from conducting a Store Closing Sale or the associated closing of stores.

26. Further, with respect to Liquidation Sale Laws, typical statutes and regulations provide that if a liquidation or bankruptcy sale is court-authorized, a company need not comply with these Liquidation Sale Laws. Moreover, pursuant to Bankruptcy Code section 105, the Court has the authority to permit a Store Closing Sale to proceed notwithstanding contrary Liquidation Sale Laws. See 11 U.S.C. § 105. Moreover, 28 U.S.C. § 959, which requires trustees (and, thus, debtors in possession) to otherwise comply with state and other laws in performance of their duties, does not apply to a Store Closing Sale. Courts have also held that 28 U.S.C. § 959 does not apply to debtors or their agents when they are liquidating assets. See, e.g., Cal. State Bd. of Equalization v. Goggin, 191 F.2d 726 (9th Cir. 1951) (holding that 28 U.S.C. § 959 does not apply to transactions that are in the nature of liquidation), cert. denied, 342 U.S. 909 (1952); see also In re Borne Chem. Co., Inc., 54 B.R. 1260, 135 (Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 959(b) is applicable only when property is being managed or operated for purpose of continuing operations). Finally, even if state or local law does not expressly except bankruptcy sales from its ambit, to the extent that such state or local law conflicts with federal bankruptcy laws, such state or local law is preempted by the Supremacy Clause of the United States Constitution. To hold otherwise would severely impair the relief otherwise available under Bankruptcy Code section 363. In concert with this premise, bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. See, e.g., In re Shenango Group, Inc., 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have

unique fiduciary and legal obligations pursuant to the bankruptcy code . . . . [A] state statute []

cannot place burdens on them where the result would contradict the priorities established by the

federal bankruptcy code.").  While preemption of state law is not always appropriate, as when

the protection of public health and safety is involved, it is appropriate when, as here, the only

state laws involved concern economic regulation.  In re Baker & Drake, 35 F.3d 1348, 1353 (9th

Cir. 1994) ("[F]ederal bankruptcy preemption is more likely . . . where a state statute is

concerned with economic regulation rather than with protecting the public health and safety.").

Here, Bankruptcy Code section 363, which requires debtors to operate their businesses in a way

that maximizes recoveries for creditors, will be severely undermined if the Court does not

provide for the waiver of the Liquidation Sale Laws.  Similar relief has been granted in other

bankruptcy cases.  See, e.g., In re FAO, Inc., Case No. 03-61826 (LK) (Bankr. D. Del.); In re

Golf Am. Stores, Inc., Case No. 02-12313 (PJW) (Bankr. D. Del.); In re Bradlees, Inc., Case No.

00-16033 (BRL) (Bankr. S.D.N.Y.); In re Big V Stores, Case No. 00-4372 (PJW) (Bankr. D.

Del.); In re Circuit City Stores, Inc., Case No. 08-35653 (KRH) (Bankr. E.D. Va.).

**D.      Waiver of the Ten-Day Stay in Bankruptcy Rule 6004.**

27.      Bankruptcy Rule 6004(h) provides that: "[a]n order authorizing the use, sale, or

lease of property is stayed until the expiration of 10 days after entry of the order, unless the court

orders otherwise."  Fed. R. Bankr. P. 6004(h).  The Debtor requests that the Court waive the ten-

day stay of Bankruptcy Rule 6004 with respect to the Proposed Store Closing Sales following

entry of the Sale Order.  By waiving such requirements, the Debtor and the winning Bidder will

be able to immediately close the transactions approved by the Sale Order, which will in turn save

the Debtor continued accrual of administrative expenses and thereby benefit the Debtor's estate.

## NOTICE

28.     Notice of this Motion will be given to: (i) the Office of the United States Trustee for the Eastern District of Virginia; (ii) counsel to the agent for the Debtor's prepetition and proposed postpetition lenders; (iii) the members of the Committee; (iv) landlords at the Proposed Store Closing Sales; (v) all state attorneys general in states affected by the Proposed Store Closing Sales; and (vi) all parties requesting service of pleadings in this case.  The Debtor submits that, under the circumstances, no other or further notice of the Motion is required.

## WAIVER OF MEMORANDUM OF LAW

29.     Pursuant to Local Bankruptcy Rule 9013-1(G), and because there are no novel issues of law presented in the Motion and all applicable authority is set forth in the Motion, the Debtor requests that the requirement that all motions be accompanied by a separate memorandum of law be waived.

## NO PRIOR REQUEST

30.     No previous motion for the relief sought herein has been made to this or any other Court.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that this Court (i) enter the Proposed

Orders; and (ii) grant the Debtor such further relief that is just and equitable.


Dated: February 12, 2009
      Richmond, Virginia

                  */s/ Lynn L. Tavenner*
                  Lynn L. Tavenner (VSB No. 30083)
                  Paula S. Beran (VSB No. 34679)
                  TAVENNER & BERAN, PLC
                  20 North 8th Street, Second Floor
                  Richmond, Virginia 23219
                  (804) 783-8300

                  Proposed Attorneys for the
                  Debtor in Possession


## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing Motion of the Debtor (I) For Entry of an Order Approving Bidding Procedures and Payment of Break-Up Fee in Connection with Agency Agreement for Proposed Store Closing Sales and Granting Certain Related Relief and (II) For Entry of Order Pursuant to Bankruptcy Code Sections 105, 363, and 503 and Bankruptcy Rules 2002, 6003, 6004, and 9007 Authorizing Debtor to Enter into Agency Agreement in Connection with Proposed Store Closing Sales and Granting Certain Related Relief was served via United States mail, first class, postage prepaid and/or by electronic delivery to all of the parties on the Primary Service List (as defined in the Case Management Order) on the _12th____ day of February, 2009.


                  _/s/ Lynn L. Tavenner_____


\7593990

# PROPOSED BIDDING PROCEDURES ORDER

Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
TAVENNER & BERAN, PLC
20 North 8th Street, Second Floor
Richmond, Virginia 23219
(804) 783-8300
Proposed Attorneys for the
Debtor in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-------------------------------------------------------x
In re                                   :        Chapter 11
                                        :
S & K Famous Brands, Inc.,              :        Case No. 09-30805 (KRH)
                                        :
                  Debtor.               :
-------------------------------------------------------x

**ORDER (A) APPROVING BID PROCEDURES AND PAYMENT**
**OF BREAK-UP FEE RELATED TO AGENCY AGREEMENT IN**
**CONNECTION WITH PROPOSED STORE CLOSING SALES,**
**AND (B) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[1] of the Debtor seeking, *inter alia*, an order (i) approving

certain bidding procedures described therein (collectively, the "Bidding Procedures") with

respect to the Debtor's proposed entry into a Store Closing Sales Agreement and (ii) granting

related relief (collectively, the "Bidding Procedures Order"); and it appearing that proper and

adequate notice of the request in the Motion for entry of this Bidding Procedures Order has been

given and that no other or further notice is necessary; and it appearing that the relief requested in

the Motion with respect to the Bidding Procedures Order is in the best interests of the Debtor's

estate, its creditors, and other parties in interest; and upon the record herein; and after due

deliberation thereon; and good and sufficient cause appearing therefor,

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

2

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The request in the Motion for entry of the Bidding Procedures Order is GRANTED.

2.      The Bidding Procedures, including the Break-Up Fee (as defined therein), are hereby APPROVED.

3.      The Debtor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

4.      All bidders submitting a Qualified Bid shall be deemed to have consented to the exclusive jurisdiction of the Bankruptcy Court with respect to all matters related to the Auction and the terms and the Store Closing Sales Agreement.

5.      The terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry without any stay of execution under the Bankruptcy Rules.

6.      The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived.

7.      This Court retains jurisdiction to hear and determine all matters arising from or related to the implementation or interpretation of this Order.

Dated: Richmond, Virginia
      February ___, 2009

_____
HON. KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

_____
Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
TAVENNER & BERAN, PLC
20 North 8th Street, Second Floor
Richmond, Virginia 23219
(804) 783-8300

Proposed Attorneys for the
Debtor in Possession

## **CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)**

I hereby certify the foregoing proposed order has been endorsed by all necessary parties.

_____

7616621.1

**PROPOSED SALE ORDER**

Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
TAVENNER & BERAN, PLC
20 North 8th Street, Second Floor
Richmond, Virginia 23219
(804) 783-8300
Proposed Attorneys for the
Debtor in Possession


                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE EASTERN DISTRICT OF VIRGINIA
                              RICHMOND DIVISION


-------------------------------------------------------x
In re                                  :        Chapter 11
                                       :
S & K Famous Brands, Inc.,             :        Case No. 09-30805 (KRH)
                                       :
                 Debtor.               :
-------------------------------------------------------x


          ORDER GRANTING MOTION OF THE DEBTOR PURSUANT TO
            BANKRUPTCY CODE SECTIONS 105 AND 363 AND
         BANKRUPTCY RULES 2002, 6003, 6004, AND 9007 AUTHORIZING
         DEBTOR TO ENTER INTO AGENCY AGREEMENT IN CONNECTION WITH
         PROPOSED STORE CLOSING SALES, AND GRANTING RELATED RELIEF

          Upon the motion (the "Motion")[1] of the Debtor for an order, pursuant to

Bankruptcy Code sections 105(a) and 363 and Bankruptcy Rules 2002, 6003, 6004, and 9007

authorizing the Debtor to enter into a Store Closing Sale Agreement; and it appearing that the

relief requested by the Motion is in the best interests of the Debtor's estate, the Debtor's

creditors, and other parties in interest; and after due deliberation and sufficient cause appearing

therefor, it is hereby

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or
       the Store Closing Sales Agreement, as applicable.

**FOUND AND DETERMINED that:**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue of the Debtor's chapter 11 case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      Due and sufficient notice of the Motion has been given under the particular circumstances and no other or further notice need be given.

4.      Time is of the essence in conducting the Proposed Store Closing Sales.

5.      The Debtor's decision to enter into the Store Closing Sales Agreement is a reasonable exercise of the Debtor's sound business judgment and is in the best interests of the Debtor, its estate, the Debtor's creditors, and all parties in interest.  Therefore, it is hereby

**ORDERED, ADJUDGED, AND DECREED that**:

1.      The Motion is GRANTED and any objections not resolved on the record at the hearing are overruled.

2.      Pursuant to Bankruptcy Code sections 105 and 363, the Debtor is authorized to enter into and consummate the Store Closing Sales Agreement attached hereto as Exhibit A with the agent referenced therein (the "Agent") without further order of this Court.

3.      The Sale Guidelines attached hereto as Exhibit B are hereby approved.

4.      The Store Closing Agreement (and each of the transactions contemplated hereby) is approved in its entirety.

5.      The Debtor and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby.

6.       The Agent shall be entitled to sell all Merchandise free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise or the Proceeds attaching only to the Guaranteed Amount, the Recovery Amount and other amounts to be received by Debtor under this Agreement.

7.       The Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of Debtor as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person subject to compliance with the Sale Guidelines and Approval Order with respect to the Merchandise and Owned FF&E Assets.

8.       The Agent, as agent for Debtor, is authorized to conduct, advertise, post signs and otherwise promote the Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without compliance with the Liquidation Sale Laws, subject to compliance with the Sale Guidelines and Approval Order.

9.       The Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos and customer lists relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of this Agreement.

10.      All newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Debtor and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement.

11.     All utilities, landlords, creditors and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or otherwise impedes the conduct of the Sale

12.     The Bankruptcy Court shall retain jurisdiction to enforce this Agreement.

13.     The Agent shall not be liable for any claims against the Debtor other than as expressly provided for in this Agreement.

14.     To the extent the Agent is owed the Adjustment Amount, and the Lenders received the Adjustment Amount, then the Lenders shall promptly, upon the written request of the Agent, disgorge and remit the Adjustment Amount to the Agent to the extent of availability under the Debtor-in-Possession Credit Facility.

15.     The Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 16 of the Agreement (without the necessity of filing financing statements to perfect the security interests),

16.     Any amounts owed by Debtor to Agent under this Agreement shall be granted the status of superpriority claims in Bankruptcy Case pursuant to Bankruptcy Code section 364(a), provided, however, that such amounts are and shall be junior in priority only to the Lenders' superpriority claim under the DIP Financing and the Professional Fee Carve-Out (as defined in the DIP Financing).

17.     The Agent shall be permitted to include in the Sale Additional Goods in accordance with the terms and provisions of this Agreement, and to the extent that Agent complies with Section 8.9 of the Agreement, Agent shall be deemed to be in compliance with the

Liquidation Sale Laws and consumer protection laws (including consumer laws relating to deceptive practices and false advertising).

18.     The Debtor shall not grant any new lien or superpriority claim senior or equal in priority to Agent's security interest or the amounts owed by Debtor to Agent hereunder.

19.     Notwithstanding Bankruptcy Rules 6004 and 6006, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

20.     The Court shall retain exclusive jurisdiction to resolve any dispute arising from or relating to the interpretation or implementation of this Order.

Dated:  Richmond, Virginia
        February __, 2009


_____
UNITED STATES BANKRUPTCY JUDGE


WE ASK FOR THIS:

_____
Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
TAVENNER & BERAN, PLC
20 North 8th Street, Second Floor
Richmond, Virginia 23219
(804) 783-8300

Proposed Attorneys for the
Debtor in Possession


### CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)

I hereby certify that the foregoing proposed order has been endorsed by all necessary parties.

_____

\7625593.1

## AGENCY AGREEMENT

This Agency Agreement (this "Agreement") is made as of February 12, 2009, between S&K Famous Brands, Inc., a Virginia corporation with a principal place of business at 11100 W. Broad Street, Glen Allen, VA 23060 (the "Merchant") and Gordon Brothers Retail Partners, LLC (the "Agent").

## R E C I T A L S

WHEREAS, on February 9, 2009 (the "Petition Date"), the Merchant filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court"), Case No. 09-30805(KRH) (the "Bankruptcy Case");

WHEREAS, the Merchant operates retail stores in the United States and desires that the Agent act as the Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as hereinafter defined) located in Merchant's thirty (30) retail store locations identified on Exhibit 1 attached hereto (each individually a "Store," and collectively the "Stores") by means of a promotional store closing, or similar sale (as further described below, the "Sale"); and (b) disposing of the Owned FF&E (as hereinafter defined) in the Stores.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and the Merchant hereby agree as follows:

Section 1. Defined Terms. The terms set forth below are defined in the referenced sections of this Agreement:

| Defined Term | Section Reference |
|---|---|
| Additional Goods | Section 8.10 |
| Adjustment Amount | Section 3.3(a) |
| Agency Accounts | Section 7.2(a) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent Indemnified Parties | Section 13.1 |
| Agent's Fee | Section 3.1(b) |
| Approval Order | Section 2(b) |
| Bankruptcy Case | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Code | Recitals |
| Beneficiaries | Section 3.4 |
| Benefits Cap | Section 4.1(b) |
| Central Service Expenses | Section 4.1(i) |
| Defective Merchandise | Section 5.2(b) |
| Designated Deposit Accounts | Sections 7.2(b) |
| Display Merchandise | Section 5.2(b) |
| Estimated Guaranteed Amount | Section 3.3(a) |
| Events of Default | Section 14 |
| Excluded Benefits | Section 4.1(ii) |
| Excluded Defective Merchandise | Section 5.2(b) |
| Expenses | Section 4.1 |

| | |
|---|---|
| FF&E | Section 5.2(a) |
| Final Inventory Report | Section 3.3(a) |
| Final Reconciliation | Section 8.7 |
| Gift Certificates | Section 8.6 |
| Gross Rings | Section 6.3 |
| Guaranteed Amount | Section 3.1(a) |
| Guaranty Percentage | Section 3.1(a) |
| Initial Guaranty Payment | Section 3.3(a) |
| Inventory Taking | Section 5.1(a) |
| Inventory-Taking Service | Section 5.1(a) |
| Inventory-Taking Instructions | Section 5.1(a) |
| Layaway Merchandise | Section 5.2(b) |
| Lenders | Section 2(b) |
| Lenders' Designated Account | Section 3.3(a) |
| Letter of Credit | Section 3.4 |
| Liquidation Sale Laws | Section 2(c) |
| Merchandise | Section 5.2(a) |
| Merchandise Threshold | Section 3.1(c) |
| Merchant | Preamble |
| Merchant Consignment Goods | Section 5.4 |
| Occupancy Expenses | Section 4.1 |
| Owned FF&E | Section 15.9 |
| Payment Date | Section 3.3(a) |
| Petition Date | Recitals, Section 2(b) |
| Proceeds | Section 7.1 |
| Recovery Amount | Section 3.1(b) |
| Remaining Merchandise | Section 3.2(b) |
| Retained Employee | Section 9.1 |
| Retention Bonuses | Section 9.4 |
| Returned Defective Merchandise | Section 8.5 |
| Returned Merchandise | Section 8.5 |
| Returned Merchandise Log | Section 8.5 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 8.1 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3 |
| Sales Taxes Account | Section 8.3 |
| Sharing Threshold | Section 3.1(b) |
| Store(s) | Recitals |
| Supplies | Section 8.4 |
| WARN Act | Section 9.1 |
| Weekly Sale Reconciliation | Section 8.7 |
| Wells Fargo | Section 2(b) |

Section 2.  <u>Appointment of Agent/Liquidation Sale Laws/Approval Order</u>.

(a)	Effective upon the entry of the Approval Order, the Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as the Merchant's exclusive agent for the limited purpose of conducting the Sale at the Stores and disposing of the Owned FF&E in the Stores in accordance with the terms and conditions of this Agreement.

(b)     Within one (1) business day after the execution of this Agreement, Merchant will file a motion with the Bankruptcy Court seeking an expedited hearing on the entry of an order approving this Agreement and authorizing Merchant and Agent to conduct the Sale in accordance with the terms hereof (the "Approval Order").  The Approval Order shall provide, in a form reasonably satisfactory to the Merchant, Agent, and to Wells Fargo Retail Finance, LLC ("Wells Fargo"), as administrative agent for itself and the other lenders (collectively, the "Lenders") under the Merchant's debtor-in-possession financing (the "DIP Financing"), *inter alia*, that (i) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (ii) Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iii) Agent shall be entitled to sell all Merchandise hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise or the Proceeds attaching only to the Guaranteed Amount, the Recovery Amount and other amounts to be received by Merchant under this Agreement; (iv) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person subject to compliance with the Sale Guidelines and Approval Order with respect to the Merchandise and Owned FF&E Assets; (v) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without compliance with the Liquidation Sale Laws, subject to compliance with the Sale Guidelines and Approval Order; (vi) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos and customer lists relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of this Agreement; (vii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement; (viii) all utilities, landlords, creditors and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or otherwise impedes the conduct of the Sale; (ix) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (x) Agent shall not be liable for any claims against the Merchant other than as expressly provided for in this Agreement; (xi) to the extent the Agent is owed the Adjustment Amount, and the Lenders received the Adjustment Amount, then the Lenders shall promptly, upon the written request of the Agent, disgorge and remit the Adjustment Amount to the Agent to the extent of availability; (xii) Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 16 hereof (without the necessity of filing financing statements to perfect the security interests), (xiii) any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Bankruptcy Case pursuant to Bankruptcy Code section 364(a), provided, however, that such amounts are and shall be junior in priority only to the Lenders' superpriority claim under the DIP Financing and the Professional Fee Carve-Out (as defined in the DIP Financing); (xiv) Agent shall be permitted to include in the Sale Additional Goods in accordance with the terms and provisions of this Agreement, and to the extent that Agent complies with Section 8.9 hereof, Agent shall be deemed to be in compliance with the Liquidation Sale Laws and consumer protection laws (including consumer laws relating to deceptive practices and false advertising); and (xv) Merchant shall not grant any new lien or superpriority claim senior or equal in priority to Agent's security interest or the amounts owed by Merchant to Agent hereunder.

(c)     Subject to entry of the Approval Order, Agent shall be authorized to conduct, advertise, post signs and otherwise promote the Sale as a "store closing," "sale on everything," "everything must go," or similar-themed sale, without further consent of any person, in accordance with

the terms and conditions of this Agreement and the Sale Guidelines and without further compliance with applicable federal, state or local laws governing, *inter alia*, the conduct of store closing or similarly-themed sales (the "Liquidation Sale Laws"), other than those designed to protect public health and safety, provided that, the Approval Order shall provide that with respect to the use of signwalkers and exterior banners, so long as the Sale is conducted in accordance with the Sale Guidelines and in a safe and professional manner, public health and safety laws purporting to govern the use of signwalkers and banners shall be deemed Liquidation Sale Laws.

Section 3.    Consideration to Merchant and Agent.

3.1    Payments to Merchant.

(a)    As a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive twenty-four percent (24%) (the "Guaranty Percentage") of the aggregate Retail Value of the Merchandise (the "Guaranteed Amount"), which Guaranteed Amount shall be paid at such time and in such manner as shall hereinafter be provided.

(b)    To the extent that Proceeds exceed the sum of (i) the Guaranteed Amount, (ii) Expenses of the Sale and (iii) two percent (2%) of the aggregate Retail Value of the Merchandise (the "Agent's Fee") (the sum of (i), (ii) and (iii), the "Sharing Threshold"), then all Proceeds of the Sale above the Sharing Threshold shall be shared fifty percent (50%) to Merchant and fifty percent (50%) to Agent. All amounts, if any, to be received by Merchant from Proceeds in excess of the Sharing Threshold shall be referred to as the "Recovery Amount." The Agent shall pay to Merchant the Guaranteed Amount and the Recovery Amount, if any, in the manner and at the times specified in Section 3.3. The Guaranteed Amount and the Recovery Amount will be calculated based upon the aggregate Retail Value of the Merchandise as determined by (A) the final certified report of the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant; (B) the aggregate Retail Value of the Merchandise subject to Gross Rings, as adjusted for shrinkage per this Agreement; and any other adjustments to Retail Value as expressly contemplated by this Agreement.

(c)    The Guaranty Percentage has been fixed based upon the aggregate Retail Value of the Merchandise, being not less than $8,100,000 (the "Merchandise Threshold") and no more than $8,400,000 (the "Merchandise Ceiling"). To the extent that the aggregate Retail Value of the Merchandise included in the Sale is less than the Merchandise Threshold or more than the Merchandise Ceiling, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(c) annexed hereto.

3.2    Compensation to Agent, Subject to entry of the Approval Order:

(a)    Agent shall receive, as its compensation for services rendered to Merchant, the Agent's Fee, all proceeds from the sale of Additional Goods less the Merchant Additional Goods Amount, plus Proceeds of the Sale above the Sharing Threshold, less the Recovery Amount. Agent shall also be entitled to receive a commission based on the sale of Merchant Consignment Goods as provided for in Section 5.4 and the gross proceeds of the sale of Owned FF&E in the Stores.

(b)    Provided that no Event of Default has occurred and continues to exist on the part of the Agent, and after all payments are made to the Merchant as required hereunder, all Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims and encumbrances of any kind or nature, subject to Merchant's right to payment of the Guaranteed Amount, the Recovery Amount, if any, and any other amount owing hereunder, and the proceeds received by Agent from the disposition of such unsold Merchandise shall constitute Proceeds hereunder. Agent must dispose of the Remaining Merchandise in a commercially

reasonable manner and any recovery from such disposition shall be included in the Sharing Threshold. Notwithstanding the foregoing, Agent shall exercise commercially reasonable efforts to dispose of all of the Merchandise during the Sale Term.

        3.3    <u>Time of Payments</u>.

        (a)    On the first business day following issuance of the Approval Order (the "<u>Payment Date</u>"), Agent shall pay to Merchant an amount (the "<u>Initial Guaranty Payment</u>") equal to seventy-five percent (75%) of the product of (i) the Guaranty Percentage and the estimated aggregate Retail Value of the Merchandise to be included in the Sale as reflected on Merchant's books and records on the last business day immediately preceding the Sale Commencement Date (the "<u>Estimated Guaranteed Amount</u>") by wire transfer to the account designated by Wells Fargo prior to the Payment Date (the "<u>Lenders' Designated Account</u>"). The balance of the Guaranteed Amount, if any, shall be paid by Agent by wire transfer to the account designated by Wells Fargo on the second business day following the issuance of the final report of the aggregate Retail Value of the Merchandise included in the Sale by the Inventory Taking Service, after review, reconciliation and verification thereof by Agent and Merchant in consultation with Wells Fargo (as reviewed, reconciled, and verified by the Agent and Merchant in consultation with Wells Fargo, the "<u>Final Inventory Report</u>"); <u>provided</u>, <u>however</u>, that Merchant and Agent shall exercise reasonable best efforts to reconcile and verify the Inventory Taking within ten calendar (10) days after its completion. In the event the Merchant and Agent are unable to reconcile and verify the Inventory Taking within such ten (10) day period, both the Agent and the Merchant agree to submit any disputes for expedited resolution by the Bankruptcy Court. In the event that the Initial Guaranty Payment exceeds the Guaranteed Amount, the Merchant shall pay to the Agent the amount (the "<u>Adjustment Amount</u>") by which the Initial Guaranty Payment exceeds the Guaranteed Amount and any other amounts paid by Agent on account of the Guaranteed Amount within one business day after the Final Inventory Report has been issued. To the extent that Merchant is entitled to receive a Recovery Amount from Proceeds, Agent shall pay such Recovery Amount as part of the Final Reconciliation under Section 8.6, as soon as commercially reasonable after the Sale Termination Date. To the extent that the Agent is owed the Adjustment Amount, and Merchant for any reason fails to timely pay to Agent the Adjustment Amount due, then to the extent the Lenders received any funds on account of the Guaranteed Amount from Merchant (or Agent), then the Lenders shall, within one (1) business days written demand by Agent, disgorge and remit the Adjustment Amount to Agent, subject to availability under the DIP Financing.

        (b)    All amounts required to be paid by Agent or Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; <u>provided</u>, <u>however</u>, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due. In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

        (c)    Merchant agrees that if at any time during the Sale Term Merchant holds any amounts due to Agent hereunder, Agent may in its discretion offset such amounts being held by Merchant against any amounts due and owing to Merchant pursuant to this Section 3.3 or otherwise under this Agreement. In addition, Merchant and Agent further agree that if at any time during the Sale Term, Agent holds any amounts due to Merchant under this Agreement, Agent may in its discretion offset such amounts being held by it against any amounts due and owing by, or required to be paid by, Merchant hereunder.

3.4     Security.  In order to secure the Agent's obligations under this Agreement, in respect of (x) the payment of the unpaid portion of the Guaranteed Amount, (y) Expenses of the Sale, and (z) the payment of the Recovery Amount, if any, on the Payment Date, Agent shall furnish Merchant an irrevocable standby Letter(s) of Credit naming Wells Fargo and Merchant as co-beneficiaries (the "Beneficiaries") in the aggregate original face amount equal to the difference between the Estimated Guaranteed Amount and the Initial Guaranty Payment, plus two (2) weeks' estimated Expenses that Merchant pays in the ordinary course, which shall be substantially in the form of Exhibit 3.4 hereof (collectively, the "Letter of Credit").  The Letter of Credit shall have an expiration date of no earlier than sixty days after the Sale Termination Date.  Unless the parties shall have mutually agreed that they have completed the Final Reconciliation under this Agreement, then, at least thirty (30) days prior to the initial or any subsequent expiration date, Agent shall secure and the Beneficiaries shall receive an amendment to the Letter of Credit solely extending (or further extending, as the case may be) the expiration date by at least sixty (60) days.  If the Beneficiaries fail to receive such amendment to the Letter of Credit no later than thirty (30) days before the expiration date, then all amounts hereunder shall become immediately due and payable and the Beneficiaries shall be permitted to draw under the Letter of Credit in payment of amounts owed and the Beneficiaries shall hold the balance of the amount drawn under the Letter of Credit as security for amounts that are or may become due and payable to Merchant.  At Agent's request, the Beneficiaries shall take all actions reasonably required to reduce the amount available to be drawn under the Letter of Credit by amounts credited against the Guaranteed Amount; provided, however, that the Letter of Credit shall not be reduced below two (2) weeks of estimated Expenses of the Sale.  In the event that Agent, after receipt of five (5) days' notice (which notice shall not be required if Agent or any member of Agent shall be a debtor under title 11, United States Code), fails to pay the Guaranteed Amount or any portion thereof, the Recovery Amount or any portion thereof, or any Expenses of the Sale when due, Wells Fargo or the Beneficiaries, individually or collectively, may draw on the Letter of Credit in an amount equal to the unpaid, past due amount of the Guaranteed Amount, Recovery Amount, or Expenses, subject to and without waiver of any right of Agent to dispute such amounts.

Section 4.  Expenses of the Sale.

4.1     Expenses.  Agent shall be responsible for all Expenses, which expenses shall be paid by Agent in accordance with Section 4.2 below.  As used herein, "Expenses" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term, limited to the following:

(a)     all payroll  for all Retained Employees used in connection with conducting the Sale for actual days/hours worked at a Store during the Sale Term as well as payroll for any of Merchant's former employees or temporary labor retained by Agent for the Sale;

(b)     any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Benefits) for Retained Employees used in the Sale, in an amount equal to 17% of the aggregate base payroll for each Retained Employees in the Stores (the "Benefits Cap") during the Sale Term;

(c)     costs of all security in the Stores (to the extent customarily provided in the Stores) including, without limitation, security systems, courier and guard service, armored car services, building alarm service and alarm service maintenance;

(d)     50% of the fees and costs of the Inventory Taking Service to conduct the Inventory Taking at the Stores, and 50% of the actual payroll and related costs for the Retained Employees who work at a Store during the Inventory Taking;

(e)     Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(f)     actual costs of advertising and direct mailings used in the Sale, Store interior and exterior signage and banners, and signwalkers;

(g)     local and long-distance telephone expenses incurred at the Stores;

(h)     credit card fees, bank card fees, chargebacks and discounts with respect to Merchandise sold in the Sale;

(i)     bank service charges (for Store and corporate accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(j)     costs for additional Supplies at the Stores necessary to conduct the Sale as requested by Agent;

(k)     all fees and charges reasonably required to comply with applicable laws in connection with the Sale;

(l)     Store cash theft and other store cash shortfalls in the registers;

(m)     any and all costs relating to the processing, transfer and consolidation of Merchandise between and among the Stores, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise;

(n)     Store trash and snow removal;

(o)     on-site supervision of the Stores, including any and all fees, wages and reasonable bonuses of Agent's field personnel, travel to, from or between the Stores and incidental out-of-pocket and commercially reasonable travel expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(p)     postage, courier and overnight mail charges to and from or among the Stores and central office to the extent relating to the Sale;

(q)     Agent's actual cost of capital (including Letter of Credit fees) and insurance;

(r)     Agent's reasonable out-of-pocket costs and expenses, not to exceed $100,000, including but not limited to, reasonable legal fees and expenses, incurred in connection with the review of data, preparation, negotiation and execution of this Agreement, the Approval Order and any ancillary documents; and

(s)     a pro rata portion for the Sale Term of Merchant's premium attributable to insuring the Merchandise and Additional Goods.

There will be no double payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category, and to the extent that any cap applies to any Expense shown in more than one category above, the lowest cap shall apply.

As used herein, the following terms have the following respective meanings:

(i) "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, MIS services, payroll processing, cash reconciliation, inventory processing and handling and data processing and reporting.

(ii) "Excluded Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to the Sale Commencement Date: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, termination or severance pay and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Benefits Cap, including, without limitation, any payments due under the WARN Act.

(iii) "Occupancy Expenses" means, with respect to Stores, base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, housekeeping and cleaning expenses, and rental for furniture, fixtures and equipment, and any and all other occupancy and occupancy-related expenses associated with the Sale and/or the Stores.

Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (i) Excluded Benefits; (ii) Central Service Expenses, (iii) Occupancy Expenses, (iv) any expenses of any kind relating to or arising from Merchant's home office or distribution centers, and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid by Merchant promptly when due during the Sale Term.

4.2 Payment of Expenses. Effective from and after entry of the Approval Order:

(a) Agent shall be responsible for the payment of all Expenses, whether or not there are sufficient Proceeds collected to pay such Expenses after the payment of the Guaranteed Amount. All Expenses incurred during each week of the Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available. Agent and/or Merchant may review or audit the Expenses at any time.

(b) Notwithstanding anything herein to the contrary, (i) to the extent that Proceeds are insufficient, Merchant shall not be required to fund or otherwise pay any Expenses of the Sale (but Merchant shall, in any such event, provide prompt notice to Agent that it does not intend to fund or otherwise pay an Expense) and (ii) without limitation on Expenses that may be funded in advance by Agent at Merchant's reasonable request, to the extent that Proceeds are insufficient, Agent shall fund, in advance, all payroll and related expenses for Retained Employees, in each case at least two (2) business days prior to the date that such payments are due by Merchant

Section 5. Inventory Valuation; Merchandise.

5.1 Inventory Taking.

(a) Inventory Taking. As soon as practicable following the Sale Commencement Date, but in no event later than five (5) days after the Sale Commencement Date, Merchant and Agent shall cause a SKU and retail physical inventory taking at the Stores (the "Inventory Taking"). Merchant and Agent shall jointly employ a mutually acceptable independent inventory taking service (the

"Inventory Taking Service") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions attached hereto as Exhibit 5.1(a)(i) (the "Inventory Taking Instructions"). Agent shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service plus 50% of the payroll and benefits subject to the Benefits Cap for Retained Employees used during the Inventory Taking as an Expense hereunder and Merchant shall pay the remaining fifty percent (50%) of the fees and expenses of the Inventory Taking Service and the balance of the payroll and benefits for Retained Employees used during the Inventory Taking. Except for the Inventory Taking costs payable to the Inventory Taking Service, Merchant and Agent shall each bear its respective costs and expenses relative to the Inventory Taking. Merchant, Agent and the Lenders may each have representatives present during the Inventory Taking and each shall have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that, during the conduct of the Inventory Taking in each of the Stores, the applicable Store shall be closed to the public, and no sales or other transactions shall be conducted. Merchant and the Agent further agree that until the Inventory Taking in each particular Store is completed, neither Merchant nor the Agent shall: (i) other than with respect to sales of Merchandise in the ordinary course as part of the Sale at the Stores, transfer any Merchandise to or from that Store, (ii) move Merchandise within or about the Stores so as to make any such items unavailable for counting as part of the Inventory Taking, and/or (iii) remove any hang tags, price tickets, or inventory control tags affixed to any Merchandise. Merchant and Agent agree to cooperate with each other to conduct the Inventory Taking commencing at a time that would minimize the number of hours that such locations would be closed for business.

(b)     The Agent and Merchant agree that they will, and agree to cause their respective representatives to, cooperate and assist in the preparation and the calculation of the aggregate Retail Value of the Merchandise included in the Sale, including, without limitation, the making available to the extent necessary of books, records, work papers and personnel.

5.2     Merchandise Subject to This Agreement.

(a)     For purposes of this Agreement, "Merchandise" shall mean all new, first-quality, undamaged, finished saleable goods that are owned by Merchant and located at the Stores as of the Sale Commencement Date, including (A) Defective Merchandise, (B) Display Merchandise, and (C) Merchandise subject to Gross Rings. Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise, (4) Additional Goods, (5) Merchant Consignment Goods, and (6) furnishings, trade fixtures, equipment and/or improvements to real property which are located in the Stores (collectively, "FF&E"); provided that Agent shall be permitted to sell Owned FF&E as set forth in Section 15.9; provided further that Merchandise shall include consignment goods that the Debtor is authorized by Order of the Bankruptcy Court to sell under 11 U.S.C. § 363 as part of the Sale so long as all such consigned goods included as Merchandise shall not exceed fifteen thousand dollars ($15,000) at cost and are generally comprised as set forth on Schedule 5.2(a) hereto.

(b)     As used in this Agreement, the following terms have the respective meanings set forth below:

"Defective Merchandise" means any item of inventory that is not new, first quality, undamaged finished saleable goods because it is worn, scratched, faded, mismatched, mismated, out-of-box, soiled, tailored, broken, dented, or affected by other similar defects rendering it not new, first quality. Display Merchandise shall not per se be deemed to be Defective Merchandise.

"Display Merchandise" means those items of inventory used in the ordinary course of business as displays or floor models, including inventory that has been removed from its original packaging for the purpose of putting such item on display but not customarily sold or saleable by Merchant, which goods are not otherwise damaged or defective. For the avoidance of doubt, Merchandise created solely for display, not saleable in the ordinary course of business shall not constitute Display Merchandise and shall not be sold by Agent.

"Excluded Defective Merchandise" means those items of Defective Merchandise for which Agent and Merchant do not agree upon a Retail Value.

"Layaway Merchandise" means all items of Merchandise held at the Stores on layaway pursuant to binding agreements, invoices or other legal documentation, where (A) the documentation is clear as to the name, address, telephone number, date of last payment and balance due from the customer, and (B) the goods subject to layaway are fully described in the documentation.

5.3    Valuation.

(a)    For purposes of this Agreement, "Retail Value" shall mean with respect to each item of Merchandise, the lowest ticketed, marked, shelf, file, SKU, or PLU/scan price of such item ("Base Retail"); except that:

(i)    with respect to any Merchandise with a POS or other offered or sold effective discount of greater than 50% (including without limitation any "buy one-get one" or similar multi-unit purchase promotions) at any time since December 1, 2008, the" Retail Value" shall be the lower of the Base Retail or such effective discounted price;

(ii)    with respect to all Merchandise located in the Outlet Stores (identified on Exhibit A), the "Retail Value" shall be the lower of the Base Retail or the lowest price offered to the public for such goods (whether or not actually sold) by any and all means since December 1, 2008; and

(iii)    with respect to any Defective Merchandise, the "Retail Value" shall be the price as the parties may mutually agree (and if the parties are unable to mutually agree on a Retail Value, such Defective Merchandise shall be deemed to be Excluded Defective Merchandise).

(b)    If an item of Merchandise has more than one ticketed price, or if multiple items of the same SKU are ticketed, at different prices, or have a different SKU or PLU price, the lowest ticketed, marked, SKU or PLU price on any such item shall prevail for such item or for all such items within the same SKU, as the case may be, that are located within the same Store (the "Lowest Store Price"), unless it is reasonably determined by Merchant and Agent that the applicable Lowest Store Price was mismarked or such item was priced because it was damaged or marked as "as is", in which case the higher price shall control.

5.4    Excluded Goods.  Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder.  If Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale as "Merchant Consignment Goods" at prices established by the Agent.  The Agent shall retain 20% of the sale price for all sales of Merchant Consignment Goods, and Merchant shall receive 80% of the receipts in respect of such sales.  Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the Weekly Sale Reconciliation.  If Merchant does not elect to have Agent sell merchandise not included as Merchandise, then all such items will be removed by Merchant from the Stores at its expense as soon as practicable after the Sale Commencement Date.  Except as expressly

provided in this Section 5.4, Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6.  Sale Term.

6.1  Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each Store on the first day following the entry of the Approval Order, but in no event later than February 19, 2009 (the "Sale Commencement Date").  Agent shall complete the Sale at each Store and vacate such Store, leaving it in broom-clean condition by no later than April 30, 2009 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term"), unless the Sale is extended by mutual written agreement of Merchant and Agent.  Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale at any one or more Store(s) upon not less than seven (7) days' prior written notice (a "Vacate Notice") to Merchant (as to each such Store, as applicable, the "Vacate Date").  In the event the Agent fails to provide Merchant with such timely notice, Agent shall be liable for and pay the actual amounts payable to landlords for the days by which notice of a Store closing was less than seven (7) days.

6.2  Vacating the Stores.  At the conclusion of the Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of FF&E which may be abandoned by Agent in place in a neat and orderly manner.  Agent shall vacate the Stores on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises, and Store keys to Merchant.  Agent's obligations to pay all Expenses for each Store subject to a Vacate Notice shall continue until the Vacate Date for each such Store.  All assets of Merchant used by Agent in the conduct of the Sale (*e.g.* FF&E, etc.) shall be returned by Agent to Merchant at the end of the Sale Term to the extent the same have not been consumed in the conduct of the Sale or sold (*e.g.*, Supplies).  If Agent fails to timely vacate a Store per the respective Vacate Date for such Store, Agent shall be liable for and pay the actual amounts payable to landlords and/or other Occupancy Expenses, with each incurred on or after the respective Vacate Date.

6.3  Gross Rings.  In the event that the Sale commences prior to the completion of the Inventory Taking at any Store, then for the period from the Sale Commencement Date until the Inventory Date for such Store, Agent and Merchant shall keep a strict count of register receipts and reports ("Gross Rings") to determine the Retail Value of the Merchandise sold by SKU.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Any Merchandise included in the Sale using this Gross Rings method shall be included as Merchandise.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of 101% of the aggregate Retail Value of the Merchandise sold during the Sale Term.

Section 7.  Sale Proceeds.

7.1  Proceeds.  For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) received on all sales of Merchandise made under this Agreement, exclusive of Sales Taxes; and (b) all proceeds of Merchant's insurance for loss or damage to Merchandise or loss of cash arising from events occurring during the Sale Term.  Proceeds shall also include any and all proceeds received by Agent from the disposition, in a commercially reasonable manner, of unsold Merchandise at the end of the Sale, whether through salvage, bulk sale or otherwise.

7.2  Deposit of Proceeds.

(a)     Agent may establish its own accounts, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly upon Agent's request execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, the Agent may elect to continue to use the Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts (as defined below). The Agency Accounts shall be dedicated solely to the deposit of Proceeds and the disbursement of amounts payable hereunder, and Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term (except, in the case of the period following the Sale Term, to the extent the Agency Accounts consist of Designated Depository Accounts). Upon Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be deposited into the Agency Accounts.

(b)     During the period between the Sale Commencement Date and the date Agent establishes the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be collected by Agent and deposited on a daily basis into depository accounts designated by Merchant for the Stores, which accounts shall be segregated and designated solely for the deposit of Proceeds of the Sale (including credit card proceeds), and the disbursement of amounts payable by Agent hereunder (the "Designated Deposit Accounts"). Following the payment of the Initial Guaranty Payment and the posting of the Letter of Credit and on each business day thereafter, Merchant shall promptly pay to Agent by wire funds transfer all collected funds constituting Proceeds deposited into the Designated Deposit Accounts (but not any other funds, including, without limitation, any proceeds of Merchant's inventory sold prior to the Sale Commencement Date).

7.3     Credit Card Proceeds. Agent shall have the right to use Merchant's credit card facilities (including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant identification number(s) and existing bank accounts) for credit card Proceeds relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Agent shall not accept Merchant's proprietary card. Without limiting the foregoing, Merchant shall cooperate with Agent to down-load data from all credit card terminals each day during the Sale Term and to effect settlement with Merchant's credit card processor(s) and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request following the Payment Date and the payment of all amounts then due to Merchant by Agent, Merchant shall cooperate with Agent to establish Merchant identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account. Merchant shall not be responsible for and Agent shall pay as an Expense hereunder, all credit card fees, charges and chargebacks related to the Sale, whether received during or after the Sale Term.

7.4     Petty Cash. In addition to the Guaranteed Amount, Agent shall purchase all cash in the Stores on and as of the start of business on the Sale Commencement Date and shall reimburse Merchant on a dollar for dollar basis therefor.

Section 8.     Conduct of the Sale. From and after the entry of the Approval Order:

8.1     Rights of Agent. Subject to the provisions of Section 2 hereof and except as may otherwise be provided for in the Approval Order, the Agent shall be permitted to conduct the Sale as a "store closing," "sale on everything," "everything must go," "bankruptcy" or similar themed sale throughout the Sale Term. The Agent shall conduct the Sale in the name of and on behalf of the

Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement, the Approval Order and the sale guidelines attached hereto as <u>Exhibit 8.1</u> (the "<u>Sale Guidelines</u>").  In addition to any other rights granted to Agent hereunder in conducting the Sale the Agent, in the exercise of its reasonable discretion, shall have the right:

(a)	to establish Sale prices and Store hours which are consistent with the terms of applicable leases and local laws or regulations, including without limitation Sunday closing laws;

(b)	except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, Store-level customer lists, mailing lists and email lists for the Stores (<u>provided</u>, <u>however</u>, such access shall be provided solely through Merchant's outside advertisement mailer and email services, and the Agent shall not have direct access to any personally identifiable information contained therein), computer hardware and software, existing supplies located at the Stores, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses (except as modified by the Approval Order);

(c)	(i) to be provided by Merchant with reasonable central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale to the extent that such services are normally provided by Merchant, at no additional cost to Agent; <u>provided</u>, <u>however</u>, that, in the event that Agent expressly requests Merchant to provide services other than those normally provided to the Stores relating to the sale of merchandise by Merchant, Agent shall be responsible for the actual incremental cost of such services as an Expense; and (ii) to use reasonably sized offices located at Merchant's central office facility to effect the Sale;

(d)	to establish and implement advertising, signage and promotion programs consistent with the "store closing," "sale on everything," "everything must go," or similar theme (including, without limitation, by means of media advertising, A-frame and similar interior and exterior signs and banners, and the use of sign walkers) in a manner consistent with the Sale Guidelines and the Approval Order;

(e)	to transfer Merchandise between and among the Stores; <u>provided</u>, <u>however</u>, the Agent shall not transfer Merchandise between and among Stores until the Inventory Taking at the transferring and receiving Stores have been completed;

(f)	upon entry of the Approval Order, Agent shall be authorized to conduct the Sale in accordance with the provisions of the Sale Guidelines and Approval Order; and

(g)	Subject to authorization in the Approval Order, include the Additional Goods in the Sale as set forth in Section 8.9.

8.2	<u>Terms of Sales to Customers; Final/As Is Sales.</u>  All sales of Merchandise will be "final sales" and "as is," and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash, nationally recognized bank credit cards and, in Agent's discretion, personal checks, <u>provided</u>, <u>however</u>, if Agent determines to accept personal checks, Agent shall bear the risk of nonpayment or loss with respect thereto.  Agent shall not accept or honor any coupons during the Sale Term.  The Agent shall clearly mark all tickets and receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the merchandise sold prior to the Sale Commencement Date.

8.3    Sales Taxes.

(a)    During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and Additional Goods and collected by Agent, on Merchant's behalf, at the time of sale.  All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes from the Sales Taxes Account.  Merchant will be given access to the computation of gross receipts for verification of all such tax collections.  Provided that Agent performs its responsibilities in accordance with this Section 8.3, Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)    Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4    Supplies.  Agent shall have the right to use, without charge, all existing supplies located at the Stores including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies").  In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor.

8.5    Returns of Merchandise.

Agent shall accept returns of merchandise sold by Merchant prior to the Sale Commencement Date ("Returned Merchandise"), provided that such return is accompanied by the original Store register receipt and is otherwise in compliance with Merchant's return and price adjustment policy in effect as of the date such item was purchased.  Subject to Merchant's right to return such defective goods to Merchant's vendors, if such Returned Merchandise is saleable as new, first-quality, undamaged, finished saleable goods, it shall be included in the Sale as Merchandise and shall be valued at the Retail Value applicable to such item multiplied by the inverse of the then prevailing Sale discount.  In the event that Returned Merchandise constitutes Defective Merchandise ("Returned Defective Merchandise"), Merchant and Agent shall mutually agree upon the Retail Value for such item of Returned Defective Merchandise; provided, however, in the event that Merchant and Agent cannot mutually agree upon the Retail Value for such Returned Defective Merchandise, then such Returned Defective Merchandise shall constitute Excluded Defective Merchandise and be excluded from the Sale.  The aggregate Retail Value of the Merchandise shall be increased by the Retail Value of any Returned

Merchandise included in Merchandise (determined in accordance with this Section 8.5), and the Guaranteed Amount shall be adjusted accordingly. Merchant shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any Returned Merchandise; provided, however, to the extent that the Guaranteed Amount has been paid in full, unless and until Merchant and Agent agree to a mutually acceptable escrow or reserve sufficient to insure that Merchant will have sufficient funds to reimburse Agent pursuant to this Section 8.5, Agent shall have no further obligations pursuant to this Section 8.5. Any increases in the Guaranteed Amount in connection with returned Merchandise shall be accounted for on a weekly basis. Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of Merchandise, all returns must be noted and described in a detailed log and shall identify the receipt number for the original receipt and the date the item was purchased (the "Returned Merchandise Log"), to be maintained by Agent in a form reasonably acceptable to Agent and Merchant. Agent shall provide Merchant with a copy of any Returned Merchandise Log on a weekly basis during the Sale.

8.6    Gift Certificates. During the Sale Term, Agent shall accept Merchant's gift certificates, gift cards and similar Merchandise credits issued by Merchant within one (1) calendar year before the Petition Date (collectively, the "Gift Certificates"); and Merchant shall reimburse Agent in cash for such amounts during the weekly sale reconciliation provided for in Section 8.7. Under no circumstances shall Agent be permitted to sell any Gift Certificates.

8.7    Sale Reconciliation. On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "Weekly Sale Reconciliation"). Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (the "Final Reconciliation"), the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent. Within five (5) days after the completion of the Final Reconciliation, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation. During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds and Expenses to review and audit such records.

8.8    Force Majeure. If any casualty, act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any Store for five (5) or more days such Store and the Merchandise located at such Store shall be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) subject to the terms of Section 7.1 above, the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant or the Lenders, as the case may be, shall within five (5) business days following written demand by Agent reimburse Agent for the amount the Guaranteed Amount is so reduced.

8.9    Merchant's Right to Monitor. Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale. Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.10    Additional Goods.

(a)    Agent may (but shall not be required to), at Agent's sole cost and expense (which cost and expense may be recovered by Agent as set forth in subparagraph (b) below), supplement the Merchandise in the Stores with additional goods, of like kind and quality, as is customarily sold in the Stores (the "Additional Goods"), provided however that the Additional Goods will not exceed more than $4,000,000 at Retail Value.  Sales of Additional Goods shall be run through Merchant's cash register systems, provided, however, that Agent shall mark the Additional Goods using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Goods from the sale of Merchandise.  Agent and Merchant shall also cooperate so as to ensure that the Additional Goods are marked in such a way that a reasonable consumer could identify the Additional Goods as non-Merchant goods.  Merchant and Agent agree that the transactions relating to the Additional Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes.  At all times and for all purposes, the Additional Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity (including, without limitation, Merchant) shall have any claim against any of the Additional Goods or their proceeds, except to the extent set forth in Section 8.9(b).  The Additional Goods shall at all times remain subject to the exclusive control of Agent, and Agent shall, at Agent's sole cost and expense (and not as an Expense of the Sale), insure the Additional Goods and, if required, promptly file any proofs of loss with regard thereto with Agent's insurers.  Merchant and Agent shall reconcile the proceeds from the sale of Additional Goods as part of the Weekly Sale Reconciliation process.  Merchant acknowledges that the Additional Goods shall be consigned goods under Article 9 of the Uniform Commercial Code (the "UCC") and hereby authorizes Agent to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's  interest in the Additional Goods as consigned goods thereunder and the Merchant as the consignee therefor.

(b)    As consideration for allowing the Agent to supplement the Merchandise with Additional Goods pursuant to the terms and conditions of Section 8.9(a), Agent shall pay to Merchant five percent (5%) of the gross proceeds of Additional Goods made in the Stores during the Sale Term, net only of Sales Taxes.

Section 9.    Employee Matters.

9.1    Merchant's Employees.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems expedient, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date.  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement or be deemed a joint or successor employer with respect to such employees.  Agent shall comply in the conduct of the Sale with all of Merchant's employee rules, regulations, guidelines and policies which have been provided to Agent in writing.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store employees prior to the Sale

Termination Date.  Merchant shall not transfer any Retained Employee during the Sale Term without Agent's prior consent, which consent shall not be unreasonably withheld.

9.2     Termination of Employees.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least seven (7) days prior thereto, so that Merchant may coordinate the termination of such employee; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (which shall consist of dishonesty, fraud or breach of employee duties), the seven (7) day notice period shall not apply; provided further, however, that Agent shall immediately notify Merchant of the basis for such "cause" so that Merchant can arrange for termination of such employee.  From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent.  Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee.

9.3     Payroll Matters.  During the Sale Term, Merchant shall process the base payroll for all Retained Employees and any former employees and temporary labor retained by Agent.  Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Merchant shall transfer, or, to the extent that the Payment Date has passed, Agent shall transfer, to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week which constitute Expenses hereunder.

9.4     Employee Retention Bonuses.  Agent may pay, as an Expense, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees, to such Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as it may determine in its discretion.  The amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.  Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within three (3) business days after the Sale Commencement Date.

Section 10.  Conditions Precedent and Subsequent.  The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)     All representations and warranties of Merchant and Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date.

(b)     Merchant shall have obtained entry of an order approving the Breakup Fee and bidding procedures set forth in Section 15.11 on or before February 19, 2009, provided, however, that the Bankruptcy Court must approve the Breakup Fee before any auction that takes place pursuant to Section 15.11.

(c)     Merchant shall have obtained entry of the Approval Order on or before February 19, 2009.

(d)     Merchant shall have obtained the consent of Wells Fargo, as agent for the Lenders, to this Agreement.

Section 11.     <u>Representations, Warranties and Covenants</u>.

11.1     <u>Merchant's Representations, Warranties and Covenants</u>.  Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)     Each entity comprising Merchant (i) is a corporation or a limited liability company duly organized, validly existing and in good standing under the laws of the state or province of its formation (except as may be a result of the commencement any Chapter 11 Cases for Merchant); (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Subject to receipt of the Approval Order, and subject to the consent of the Lenders:  (i) the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its obligations thereunder; (ii) Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder; and (iii) each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms.

(c)     Merchant owns, and will own at all times during the Sale Term, good and marketable title to all of the Merchandise to be included in the Sale, free and clear of all liens, claims and encumbrances of any nature, other than the liens listed on <u>Exhibit 11.1(c)</u> and any applicable statutory liens.  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds other than as provided for herein (including those listed on <u>Exhibit 11.1(c)</u> and any applicable statutory liens).  Any Approval Order shall provide that all such liens shall be transferred to and attach only to the Guaranteed Amount or other amounts payable to Merchant hereunder.

(d)     Merchant has maintained its pricing files in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdowns), and all pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale markdowns, as of the dates and for the periods indicated therein. Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)     Through the Sale Commencement Date, Merchant has, and shall continue to, ticket or mark all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, Merchant's other stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.  Merchant has not removed any sale stickers or other markings indicating items are on sale from the Merchandise prior to the Sale Commencement Date, and has not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(f)     Since December 1, 2008, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores any merchandise or goods outside the ordinary course.

(g)     To the best of Merchant's knowledge, all Merchandise is in compliance with all applicable federal, state or local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)     Subject to the provisions of the Approval Order, throughout the Sale Term, the Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, each of the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores.  Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary for (i) the conduct of the Sale at the Stores.  Except any amounts owing as a result of the commencement of any Chapter 11 Case, and absent a bona fide dispute, throughout the Sale Term Merchant shall remain current on all expenses and payables necessary for the conduct of the Sale (other than those relating to any period prior to the commencement of any Chapter 11 Case), subject to any restrictions that may be imposed under the Bankruptcy Code.

(i)     Except any amounts owing as a result of the commencement of any Chapter 11 Case, Merchant had paid, and will continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs (other than those relating to any period prior to the commencement of any Chapter 11 Case).

(j)     Since December 1, 2008, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including, without limitation, increasing salaries or other amounts payable to employees, except (i) there may be instances that, in an effort to encourage one or more employees to remain in Merchant's employ, Merchant increased the salaries of or agreed to provide bonuses to such employees (such action not being with any intent to increase any Expenses of the Sale or in anticipation thereof); and (ii) to the extent an employee was due an annual raise.  Merchant shall discontinue the foregoing practices from and after the date hereof, unless otherwise agreed in writing between Merchant and Agent.

(k)     Except as may be impacted by the filing of the Chapter 11 Case, or otherwise restricted by the Chapter 11 filing and the motions and pleadings filed in connection therewith, Merchant has since December 1, 2008, and Merchant covenants to continue to operate the Stores in all material respects in the ordinary course of business from the date of this Agreement to the Sale Commencement Date by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies between or among Stores (or among

Merchant's other stores); and (iv) not making any management personnel moves or changes at the Stores without prior written notice to and consultation with (but not approval of) Agent.

(l)     As of the Sale Commencement Date, the assortment, mix and quantity of the Merchandise, by category, shall not be materially different than as set forth on Exhibit 11.1(l). To the extent that, after the Inventory Taking, it is determined that the assortment and mix of the Merchandise, by category, as of the Sale Commencement Date was materially different than as set forth on Exhibit 11.1(l), Merchant and Agent shall mutually and in good faith agree upon an adequate remedy for the breach of the representation in this Section 11.1(l).

(m)     To the best of Merchant's knowledge, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

11.2     <u>Agent's Representations, Warranties and Covenants</u>.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Agent: (i) is a limited partnership, corporation or limited liability company (as the case may be) duly and validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby.  (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement (other than the Approval Order), and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)     The Agent shall conduct the Sale in compliance with the Sale Guidelines and the Approval Order.

Section 12.  <u>Insurance</u>.

        12.1    <u>Merchant's Liability Insurance</u>.  Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies, including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Stores and shall endeavor to cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the wrongful acts or omissions or negligence of Agent, or Agent's employees, independent contractors or agents (including Merchant's employees being supervised by Agent).

        12.2    <u>Merchant's Casualty Insurance</u>.  Merchant will provide throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof <u>plus</u> the retail value of Additional Goods (<u>provided</u> <u>that</u>, Agent shall be responsible for payment as an Expense hereunder of any incremental premium amounts allocable to the Additional Goods).  From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured (as its interest may appear).  In the event of a loss to the Merchandise on or after the date of this Agreement, the Proceeds of such insurance attributable to the Merchandise, plus any self insurance amounts and the amount of any deductible or self-insured retention (which amounts shall be paid by Agent as an Expense), shall constitute Proceeds hereunder.  In the event of a loss to the Additional Goods on or after the date of this Agreement, the proceeds of such insurance attributable to the Additional Goods, plus any self insurance amounts and the amount of any deductible or self-insured retention (which amounts shall be paid by Agent as an Expense), shall constitute property of the Agent.  Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured (as its interest may appear), in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term.  Merchant shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

        12.3    <u>Agent's Insurance</u>.  Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named as additional insureds with respect to such policies.  Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as additional insureds, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the wrongful acts or omissions or negligence of Merchant or Merchant's independent contractors or agents, other than Agent or Agent's employees, agents or independent contractors (including Merchant's employees under Agent's supervision).

        12.4    <u>Worker's Compensation Insurance</u>.  Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

Section 13.  Indemnification.

13.1     Merchant Indemnification.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof, (iii) any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term, (iv) any consumer warranty or products liability claims relating to Merchandise, (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act),  the negligence or willful misconduct of Merchant, or its officers, directors, employees, agents or representatives.

13.2     Agent Indemnification.  Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of Merchant by Agent or any of its representatives; (iv) the negligence or willful misconduct of Agent, its officers, directors, employees, agents or representatives; (v) any breach or default arising from or relating to Agent's conduct of the Sale which is not in accordance with this Agreement or the Sale Guidelines; and (vi) violations of law.

Section 14.  Defaults.  The following shall constitute "Events of Default" hereunder:

(a)      The Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured ten (10) days after receipt of written notice thereof;

(b)      Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured ten (10) days after written notice to the defaulting party; or

(c)      The Sale is terminated or materially interrupted or impaired at the Stores for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

In the Event of Default, the non-defaulting party (in the case of (a) or (b) above), or Agent (in the case of (c) above) may in its discretion elect to terminate this Agreement, and any party's damages or entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by the Bankruptcy Court.

Section 15. <u>Miscellaneous</u>.

     15.1   <u>Notices</u>. All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows (with Merchant and Agent to receive all notices regardless of their origin):

| | |
|---|---|
| If to the Agent: | GORDON BROTHERS RETAIL PARTNERS, LLC<br>101 Huntington Avenue, 10th Floor<br>Boston, MA  02199<br>Attention: Michael Chartock<br>Tel: (617) 210-7116<br>Fax: (617) 531-7906<br>Email: <u>mchartock@gordonbrothers.com</u> |
| If to the Merchant: | S&K FAMOUS BRANDS, INC.<br>11100 W. Broad Street<br>Glen Allen, VA 23060<br>Attention: Roger Tyler<br>Tel: (804) 346-2589<br>Fax: (804) 346-2627<br>Email: <u>Rogert.tyler@skmenswear.com</u> |
| With a copy to: | McGUIREWOODS LLP<br>One James Center<br>901 East Cary Street<br>Richmond, VA 23219<br>Attention: Dion W. Hayes, Esq.<br>Tel: (804) 775-1144<br>Fax: (804) 698-2078<br>Email: <u>DHayes@mcguirewoods.com</u> |
| If to Lenders: | WELLS FARGO RETAIL FINANCE, LLC<br>One Boston Place<br>Boston, MA 02108<br>Attn:  William Chan<br>Tel: (617) 854-7254<br>Fax: (866) 349-8857<br>Email: <u>William.Chan@wellsfargo.com</u> |
| With a copy to: | RIEMER & BRAUNSTEIN LLP<br>Three Center Plaza, 6th Floor<br>Boston, MA 02108<br>Attn: Kevin J. Simard, Esq.<br>Tel: (617) 880-3431<br>Fax: (617) 692-3431<br>E-mail: <u>KSimard@riemerlaw.com</u> |

15.2    Governing Law.  This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Virginia without regard to conflicts of laws principles thereof, except where governed by the Bankruptcy Code due to the commencement of the Bankruptcy Case.

15.3    Entire Agreement.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

15.4    Amendments.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

15.5    No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

15.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

15.7    Execution in Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

15.8    Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

15.9    FF&E.  With respect to the FF&E owned by Merchant (the "Owned FF&E") and located at the Stores, Agent shall sell the Owned FF&E, and Agent shall be entitled to receive a commission equal to twenty-five percent (25%) of the gross proceeds from the sale of such FF&E (net only of Sales Taxes); provided however Merchant shall be responsible for payment of expenses incurred in connection with the disposition of the Owned FF&E in accordance with a budget to be mutually agreed upon between Merchant and Agent; provided further however, Merchant may elect to receive, in lieu of proceeds net of expenses and Agent's commission, a lump sum payment, on a per Store basis, in an amount to be agreed upon between Merchant and Agent, in which case all costs and expenses associated with the disposition thereof shall be borne by Agent.  In either event, as of the Sale Termination Date, Agent may abandon, in place, any unsold FF&E, at the Stores.

15.10    Reporting.  Upon the reasonable request of either party, the other party shall furnish weekly reports reflecting the progress of the Sale, which shall specify the Proceeds received to date and such other information regarding the Sale as the requesting party reasonably requests.  The Agent will maintain and provide to Merchant sales records to permit calculation of and compliance with any percentage of rent obligations under Store leases.  During the course of the Sale, Merchant shall have the right to have representatives continually act as observers of the Sale in the Stores, so long as they do not interfere with the conduct of the Sale.

15.11 Bidding Procedures. In consideration of Agent conducting its due diligence and entering into this Agreement, which serves as a base by which other offers may be measured and is subject to higher and better offers by other entities seeking to act as Agent (the "Competing Bidders"), by way of a bidding process, all subject to the approval of the Bankruptcy Court, Merchant shall seek the Bankruptcy Court's approval of a procedure embodying the following terms: (a) all Competing Bidders must agree to be bound by all of the terms and conditions of this Agreement except as modified as to price and other economic terms; (b) all Competing Bidders must provide adequate assurance of their ability to perform their obligations pursuant to any bid; (c) Merchant agrees that if Agent is not the successful bidder, (i) Merchant shall pay Agent in full and in cash $50,000 directly from the proceeds of any competing offer and (ii) Merchant (or the successful Competing Bidder shall be required to reimburse Agent for any Additional Goods which Agent has, as of the date of any auction, become contractually obligated to purchase (provided that Agent shall as of such date provided Merchant with a schedule of such Additional Goods commitments) (collectively, the "Break-Up Fee"); and (d) the initial overbid by any Competing Bidders must be for a Guaranteed Amount at least in excess of the amount of the Break-Up Fee. The parties agree that the Break-Up Fee shall not be subject to "credit bidding" or any net benefit to the estate analysis.

Section 16. Security Interest. Upon issuance of the Letter of Credit, and payment of the Initial Guaranty Payment, and effective as of the Payment Date, Merchant hereby grants to Agent pursuant to Bankruptcy Code § 364(d) a first priority security interest in and lien upon (i) the Merchandise; (ii) the Proceeds; (iii) the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 hereof and (iv) the Agent's commission regarding the sale or other disposition of Owned FF&E as provided for in Section 15.9 (or in the Owned FF&E to the extent that Merchant and Agent agree upon a lump sum payment for the Owned FF&E in the Stores, if any, pursuant to Section 15.9 hereof) to secure the full payment and performance of all obligations of Merchant to Agent hereunder; provided, however, until the payment of the Guaranteed Amount, Expenses and the Recovery Amount, in full, the security interest granted to Agent hereunder shall remain junior and subordinate in all respects to the security interest of Lenders to the extent of the unpaid portion of the Guaranteed Amount, Expenses and the Recovery Amount, if any. Upon entry of the Approval Order, and payment of the Initial Guaranteed Payment pursuant to Section 3.3 hereof, and the issuance of the Letter of Credit, the security interest granted to Agent hereunder shall be deemed properly perfected without the need for further filings or documentation.

IN WITNESS WHEREOF, the Agent and Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

S&K FAMOUS BRANDS, INC.

By: _____
Name: _____
Its: _____

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _Vnass K Mf_

Name: _Eachrys n . Maheron_

Its:
    _Principal & Managing Dir ._

CONSENTED AND AGREED TO
AS IT RELATES TO SECTIONS 2(b), 3.3, 3.4
5.1, 7.2, 8.7, 15.9 AND 16 HEREOF, BY:

WELLS FARGO RETAIL FINANCE, LLC, as agent

By: _____

Name _William Chun_

Title _Vice President_

EXHIBIT 1

# S&K Menswear
## Store List

| Store No. | Store | Address | City | State | Zip Code | Telephone No. | Square Ft |
|---|---|---|---|---|---|---|---|
| 36 | Hilltop North Shopping Center | 706 Hilltop North Shopping Center | Virginia Beach | VA | 23451 | (757) 640-2270 | 4,000 |
| 75 | 151 Mobile Festival Centre | 3725 Airport Boulevard | Mobile | AL | 36608 | (516) 869-7253 | 3,971 |
| 107 | Glenbrook Commons | 4122 Northrup Street | Fort Wayne | IN | 46805 | (860) 297-4536 | 4,093 |
| 124 | 1010 Pecanland Mall | 4700 Millhaven Road | Monroe | LA | 71203 | (318) 322-4635 | 3,620 |
| 179 | Crossroads at Chesapeake Square | 4107 Portsmouth Blvd., Suite 107 | Chesapeake | VA | 23321 | (630) 574-7306 | 3,600 |
| 186 | Prime Outlets at Ellenton | 5253 Factory Shops Boulevard | Ellenton | FL | 34222 | (732) 367-0129 | 2,921 |
| 193 | Ridgewood Court | 6380-B Ridgewood Court Drive | Jackson | MS | 39211 | (317) 263-8127 | 3,567 |
| 216 | Prime Outlets at Huntley | 11800 Factory Shops Boulevard, Suite 605 | Huntley | IL | 60142 | (732) 367-0129 | 3,032 |
| 221 | The Mall at Greece Ridge | 482 Greece Ridge Center Drive | Rochester | NY | 14626 | (716) 235-7140 | 4,239 |
| 236 | Northwestern Place | 4701 North University | Peoria | IL | 61614 | (309) 676-7600 | 4,121 |
| 277 | Jackson Crossing | 1210 Jackson Crossing Avenue | Jackson | MI | 49202 | (248) 592-6036 | 3,161 |
| 293 | Governor's Square Mall | 1500 Apalachee Parkway #2113 | Tallahassee | FL | 32301 | (850) 877-8106 | 4,148 |
| 309 | Easton Market | 3701 Easton Market | Columbus | OH | 43230 | (216) 755-5691 | 3,500 |
| 319 | Prime Outlets at Gaffney *Clearance Store | 830 Factory Shops Boulevard | Gaffney | SC | 29341 | (732) 367-0129 | 3,399 |
| 336 | Turtle Crossing Shopping Center | 5830 Britton Parkway | Columbus | OH | 43016 | (614) 744-3440 | 5,000 |
| 349 | Polaris Towne Center | 1311 Polaris Parkway | Columbus | OH | 43240 | (614) 887-5875 | 4,000 |
| 361 | Southlake Center | 125 Goodman Road West, Suite D | Southaven | MS | 38671 | (901) 685-2220 | 4,000 |
| 365 | Wildwood North | 130 Wildwood Parkway, Suite 112 | Homewood | AL | 35209 | (912) 355-1311 | 4,000 |
| 366 | Colonial Promenade Tutwiler Farm | 1644 Gadsden Highway, Suite 100/102 | Trussville | AL | 35173 | (205) 871-0406 | 4,299 |
| 380 | Tanger Outlet Center *Clearance Store | 10827 Kings Road, Suite 830 | Myrtle Beach | SC | 29572 | (336) 292-3010 | 3,500 |
| 401 | University Mall | 1701 McFarland Boulevard East, Suite 172 | Tuscaloosa | AL | 35404 | (205) 553-8414 | 3,535 |
| 402 | Coastal Grand | 1040 Coastal Grand Circle | Myrtle Beach | SC | 29577 | (843) 839-9110 | 3,513 |
| 428 | Wolfchase Galleria | 2760 N. Germantown Parkway, Suite 195 | Memphis | TN | 38133 | (901) 381-2769 | 3,549 |
| 429 | Regency Square | 1404 North Parham Road, Suite 209 | Richmond | VA | 23229 | (248) 258-7387 | 3,300 |
| 431 | Turtle Creek Mall | 1000 Turtle Creek Drive, Suite 700 | Hattiesburg | MS | 39402 | (601) 261-3032 | 3,500 |
| 432 | River City Marketplace | 13221 City Station Drive, Suite 153 | Jacksonville | FL | 32218 | (248) 592-6026 | 4,152 |
| 438 | Clifton Park Center | 22 Clifton Park Rd Space 34 | Clifton Park | NY | 12065 | (518) 371-1658 | 4,050 |
| 441 | University Park Mall | 6501 Grape Rd. Unit 181 | Mishawaka | IN | 46545 | (317) 263-7194 | 4,173 |
| 443 | Eastern Hills Mall | 4545 Transit Road, Suite 742 | Williamsville | NY | 14221 | (973) 279-9000 | 3,605 |
| 446 | Shoppes at University Place | 9015-5 JM Keynes Drive | Charlotte | NC | 28262 | (614) 744-2095 | 4,475 |

**EXHIBIT 3.1**

# S&K Menswear

### Merchandise Thresholds of RETAIL Inventory  (Adjustment Schedule)

| | | | | Guarantee Adjustment* | Cumulative Adjustment |
|---|---|---|---|---|---|
| If below | 9,000,000 | But above | 8,850,000 | 0.35% | 1.26% |
| If below | 8,850,000 | But above | 8,700,000 | 0.33% | 0.91% |
| If below | 8,700,000 | But above | 8,550,000 | 0.30% | 0.58% |
| If below | 8,550,000 | But above | 8,400,000 | 0.28% | 0.28% |
| If below | 8,400,000 | But above | 8,100,000 | none | 0 |
| If below | 8,100,000 | But above | 7,950,000 | 0.28% | 0.28% |
| If below | 7,950,000 | But above | 7,800,000 | 0.29% | 0.57% |
| If below | 7,800,000 | But above | 7,650,000 | 0.30% | 0.87% |
| If below | 7,650,000 | But above | 7,500,000 | 0.31% | 1.18% |
| If below | 7,500,000 | But above | 7,350,000 | 0.32% | 1.50% |
| If below | 7,350,000 | But above | 7,200,000 | 0.33% | 1.83% |
| If below | 7,200,000 | But above | 7,050,000 | 0.34% | 2.17% |
| If below | 7,050,000 | But above | 6,900,000 | 0.35% | 2.52% |
| If below | 6,900,000 | But above | 6,750,000 | 0.35% | 2.87% |
| If below | 6,750,000 | But above | 6,600,000 | 0.35% | 3.22% |
| If below | 6,600,000 | But above | 6,450,000 | 0.35% | 3.57% |
| If below | 6,450,000 | But above | 6,300,000 | 0.40% | 3.97% |
| If below | 6,300,000 | But above | 6,150,000 | 0.40% | 4.37% |
| If below | 6,150,000 | But above | 6,000,000 | 0.45% | 4.82% |
| | | If Below | 6,000,000 | breach | |
| | | If above | 9,000,000 | breach | |

* The guaranteed percentage will be reduced by a prorated amount for any partial increments.

<u>FORM OF GUARANTY LETTER OF CREDIT</u>

Bank of America

100 Federal St

Boston, Mass 02109

Date:

Irrevocable Standby Letter of Credit Number: _____

BENEFICIARIES:    S&K Famous Brands, Inc.
Wells Fargo Retail Finance, LLC

Credit Number:
Opener's Reference No:

Ladies and Gentlemen:

BY ORDER OF:    Gordon Brothers Retail Partners, LLC

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of Gordon Brothers Retail Partners, LLC for a sum or sums not exceeding a total of $_____ available by your draft(s) at SIGHT on OURSELVES effective immediately and expiring at OUR COUNTERS on June 30, 2009, or such earlier date on which the Beneficiaries shall notify us in writing that this Standby Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "<u>Expiry Date</u>").

Draft(s) must be accompanied by the original Letter of Credit and a signed statement in the form attached hereto as <u>Exhibit A</u> signed by each of S&K Famous Brands, Inc. and Wells Fargo Retail Finance, LLC (the "Beneficiaries").

This Letter of Credit may be reduced from time to time when accompanied by a signed statement from the Beneficiaries in the form attached as <u>Exhibit B</u>.

If a drawing is received by _____ at or prior to 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the account designated by Beneficiaries, as directly below, in immediately available funds on the same Business Day. If however, a drawing is received by _____ after 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the account designated by

Beneficiaries in immediately available funds on the next Business Day.

As used in this Letter of Credit "Business Day" shall mean any day other than a Saturday, Sunday or a day on which Banking Institutions in Massachusetts are required or authorized to close.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. _____ dated _____ _____of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and Practices for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 600".

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this letter of credit to the attention of our Letter of Credit Operations, Bank of America, 100 Federal Street, Boston, MA 02109 attention _____, mention our reference number as it appears above. Telephone inquiries can be made to _____ at _____.

Very truly yours,


Authorized official

TO IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Drawing for Amounts Due to:

[S&K]

{WFRF]

Ladies and Gentlemen:

We refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned: duly authorized officers of each of S&K Famous Brands, Inc. and Wells Fargo Retail Finance, LLC (the "Beneficiaries"), in its capacity as the Beneficiaries of the Letter of Credit hereby certifies to you that:

(i)     Gordon Brothers Retail Partners, LLC (the "Agent") has not made when due of or for the Estimated Guaranteed Amount and/or certain Expenses due by Agent to S&K Famous Brands, Inc. (the "Merchant"), pursuant to, and as such term is defined in that certain Agency Agreement dated as of February __, 2009 between Merchant on the one hand, and Agent, on the other.

(ii)    Beneficiaries, as Merchant's designee has given Agent five (5) business days written notice (which notice shall not be required if Agent or any member of Agent shall be a debtor under title 11, United States Code) of Merchant's intention to draw on this Letter of Credit.

(iii)   No Event of Default on the part of the Merchant under the Agency Agreement has occurred, exists or is continuing as of this date and no event now exists which solely with the passage of time or giving of notice or both would constitute an Event of Default on the part of the Merchant under the Agency Agreement.

(iv)    The amount to be drawn is $_____ (the "Amount Owing").

(v)     Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the letter of credit, less any prior drawings, as of the date hereof.

(vi)    The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(vii)   In accordance with the terms of the Letter of Credit, the payment hereby demanded is requested to be made by wire transfer to the following account.

Bank: _____

Account Name: _____

Account No. _____

Routing No. _____

FFC: _____.

IN WITNESS WHEREOF, the undersigned has executed and delivered this certificate as of this _____ day of _____, 2009.

S&K Famous Brands, Inc.            Wells Fargo Retail Finance, LLC

By: _____      By: _____

Print Name and Title:           Print Name and Title:

## IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

### Re: Reduction of Face Amount:

Ladies and Gentlemen:

We refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly authorized officers of each of S&K Famous Brands, Inc. and Wells Fargo Retail Finance, LLC in its capacity as Beneficiaries under this Letter of Credit, hereby confirm to you that the face amount of the Letter of Credit No. _____ shall be reduced from its original face amount to a new face amount of $_____.

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this _____ day of _____, 2009.

S&K Famous Brands, Inc.                    Wells Fargo Retail Finance, LLC


By: _____          By: _____
Print Name and Title:                      Print Name and Title:

**EXHIBIT 5.1(a)(i)**

**TO BE COMPLETED**

## STORE CLOSING GUIDELINES

The following procedures shall apply to the Sale[1] to be held at the closing Stores and the disposal of the FF&E in the closing Stores:

1.    The Sale shall be conducted so that the closing Stores in which sales are to occur remain open no longer than the normal hours of operation provided for in the respective leases or other occupancy agreements for the closing Stores.

2.    The Sale shall be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Sale shall be conducted on Sunday unless the Merchant had been operating such Stores on a Sunday.

3.    All display and hanging signs used by the Merchant and the Agent in connection with the Sale shall be professionally produced and all hanging signs shall be hung in a professional manner. The Merchant and the Agent may advertise the Sale as a "sale on everything", "store closing", or similar theme sale at the closing Stores as provided by the Agency Agreement.   The Merchant and the Agent shall not use neon or day-glo signs. Furthermore, with respect to enclosed mall locations to the extent the applicable Store entrance requires entry into the enclosed mall common area no exterior signs or signs in common areas of a mall shall be used. Nothing contained herein shall be construed to create or impose upon the Merchant and the Agent any additional restrictions not contained in the applicable lease or other occupancy agreement. In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at: (i) non-enclosed mall Stores, and (ii) enclosed mall Stores to the extent the applicable Store entrance does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected store shall not be wider than the closing Storefront of the closing Store and shall not be larger than three (3) feet by thirty (30) feet.  In addition, the Merchant and the Agent shall be permitted to utilize sign walkers and street signage, notwithstanding any state, county or local law or ordinance; provided however the use of sign walkers and use of street signage shall be done in a safe and professional manner and shall not be permitted on mall or shopping center property.

4.    Conspicuous signs shall be posted in the cash-register areas of each Store to the effect that all sales are "final" and that customers with any questions or complaints subsequent to the conclusion of the Sale may contact a named representative of the Merchant at a specified telephone number.  Conspicuous signage shall be posted in the cash-register area of each Store to the effect that the manufacturer's warranty, if any, may still exist and customers should consult the packaging materials to see what, if any, manufacturer's warranties are available.

5.    Within a "Shopping Center", the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any of the closing Stores, unless permitted by the applicable lease or distribution is customary in the shopping center in which the closing Store is

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agency Agreement.

located. Otherwise, the Agent may solicit customers in the closing Stores themselves. The Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the applicable landlord.

6.     At the conclusion of the Sale, Agent shall vacate the closing Stores in "broom-clean" condition, and shall otherwise leave the closing Stores in the same condition as on the commencement of the Sale, ordinary wear and tear excepted; provided, however, that the Merchant and Agent hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to any Store. The Agent and the Merchant may abandon any FF&E or other materials (the "Abandoned Property") not sold in the Sale at the closing Store premises at the conclusion of the Sale. Any Abandoned Property left in a Store after a lease is rejected shall be deemed abandoned with the landlord having the right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.

7.     Subject to the provisions of the Agency Agreement, the Agent shall have the right to sell FF&E located in the closing Stores. The Agent may advertise the sale of the FF&E consistent with these Store Closing Guidelines. Additionally, the purchasers of any FF&E sold during the Sale shall only be permitted to remove the FF&E either through the back, shipping areas or through other areas after store business hours unless otherwise agreed by on-site Shopping Center management. For the avoidance of doubt, as of the Sale Termination Date, Agent may abandon, in place, and without further responsibility, any unsold FF&E located at the closing Stores.

8.     The Agent shall not make any alterations to interior or exterior Store lighting. No property of any landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or other signage shall not constitute an alteration to a Store.

9.     At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlord of the closing Store shall have reasonable access to the closing Store premises as set forth in the applicable lease. The Merchant, the Agent, and their agents and representatives shall continue to have exclusive and unfettered access to the closing Stores.

10.     Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Court until the rejection or assumption and assignment of each lease.

11.     The rights of the landlords for any damages to the closing Stores shall be reserved in accordance with the applicable leases.

12.     The Merchant shall notify a representative of the relevant landlord of the date on which the Sale is scheduled to conclude at a given Store, within three business days of the Merchant's receipt of such notice from the Agent.

13.     To the extent that any Store landlord affected hereby contends that the Merchant is in breach or default under these Store Closing Guidelines, such landlord shall provide at least five (5) days' written notice, served by facsimile and overnight delivery, on the Merchant and the

Merchant's counsel, and the Agent and the Agent's counsel, at the following facsimile numbers and addresses:

|  |  |
|---|---|
| If to the Merchant: | S&K FAMOUS BRANDS, INC. |
|  | 11100 W. Broad Street |
|  | Glen Allen, VA 23060 |
|  | Attn: Robert Tyler |
|  | Tel: (804) 346-2589 |
|  | Fax: (804) 346-2627 |
|  | Email: rogert.tyler@skmenswear.com |
|  |  |
| With a copy to: | MCGUIRE WOODS LLP |
|  | One James Center |
|  | 901 East Cary Street |
|  | Richmond, VA 23219 |
|  | Attn: Dion W. Hayes, Esq. |
|  | Tel: (804) 775-1144 |
|  | Fax: (804) 698-2078 |
|  | Email: dhayes@mcguirewoods.com |
|  |  |
| If to the Agent: | GORDON BROTHERS RETAIL PARTNERS, LLC |
|  | 101 Huntington Avenue, 10th Floor |
|  | Boston, MA 02199 |
|  | Attn: Michael Chartock |
|  | Tel: 617-210-7116 |
|  | Fax: 617-531-7906 |
|  | Email: mchartock@gordonbrothers.com |

If the parties are unable to resolve the dispute between themselves, either the landlord or the Merchant shall have the right to request a "status hearing" before the Bankruptcy Court on no less than five (5) days notice to the other parties.

EXHIBIT 11.1(0)

# S&K Menswear
## Composition of Merchandise

| Dept # | Dept | UNITS | COST | RETAIL | % to TOTAL | IMU% | CF% |
|---|---|---|---|---|---|---|---|
| **RETAIL STORES** | | | | | | | |
| 1 | SUITS | 13,816 | 912,707 | 3,316,390 | 44.4% | 72.5% | 27.5% |
| 2 | SPORTCOATS | 3,556 | 132,716 | 496,706 | 6.6% | 73.4% | 26.6% |
| 3 | DRESS SHIRTS & TIES | 36,983 | 448,209 | 1,784,980 | 23.9% | 74.8% | 25.2% |
| 4 | SLACKS | 5,679 | 110,192 | 384,978 | 5.1% | 71.5% | 28.5% |
| 5 | SPORTWEAR | 5,250 | 121,146 | 424,365 | 5.7% | 71.2% | 28.8% |
| 6 | ACCESSORIES | 18,069 | 255,077 | 652,129 | 8.7% | 60.9% | 39.1% |
| 7 | SUIT SEPARATES | 2,817 | 115,106 | 415,907 | 5.6% | 72.5% | 27.5% |
| | TOTAL | 86,169 | 2,095,154 | 7,475,454 | 100.0% | 72.0% | 28.0% |
| **OUTLETS** | | | | | | | |
| 1 | SUITS | 1,959 | 143,576 | 461,393 | 55.1% | 68.9% | 31.1% |
| 2 | SPORTCOATS | 297 | 17,934 | 50,053 | 6.0% | 64.2% | 35.8% |
| 3 | DRESS SHIRTS & TIES | 4,555 | 62,405 | 187,699 | 22.4% | 66.8% | 33.2% |
| 4 | SLACKS | 593 | 14,271 | 36,414 | 4.3% | 60.8% | 39.2% |
| 5 | SPORTWEAR | 1,297 | 20,855 | 67,045 | 8.0% | 68.9% | 31.1% |
| 6 | ACCESSORIES | 611 | 10,378 | 24,881 | 3.0% | 58.3% | 41.7% |
| 7 | SUIT SEPARATES | 118 | 3,336 | 10,467 | 1.2% | 68.1% | 31.9% |
| | TOTAL | 9,430 | 272,756 | 837,952 | 100.0% | 67.4% | 32.6% |
| **GRAND TOTAL** | | | | | | | |
| 1 | SUITS | 15,775 | 1,056,283 | 3,777,783 | 46.1% | 72.0% | 28.0% |
| 2 | SPORTCOATS | 3,854 | 150,650 | 546,759 | 6.5% | 72.4% | 27.6% |
| 3 | DRESS SHIRTS & TIES | 41,538 | 510,614 | 1,972,679 | 23.3% | 73.9% | 26.1% |
| 4 | SLACKS | 6,271 | 124,464 | 421,392 | 5.0% | 70.4% | 29.6% |
| 5 | SPORTWEAR | 6,547 | 142,001 | 491,410 | 5.8% | 70.9% | 29.1% |
| 6 | ACCESSORIES | 18,680 | 265,455 | 677,011 | 8.1% | 60.8% | 39.2% |
| 7 | SUIT SEPARATES | 2,934 | 118,442 | 426,373 | 5.2% | 72.4% | 27.6% |
| | GRAND TOTAL | 95,599 | 2,367,910 | 8,313,406 | 100.0% | 71.4% | 28.6% |