Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
TAVENNER & BERAN, PLC
20 North 8th Street, Second Floor
Richmond, Virginia 23219
(804) 783-8300
Attorneys for the Debtor in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-------------------------------------------------------x
In re                                  :        Chapter 11
                                       :
S & K Famous Brands, Inc.,             :        Case No. 09-30805 (KRH)
                                       :
        Debtor.                        :
-------------------------------------------------------x

**MOTION FOR ORDERS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 332 AND 363 (I)(A) APPROVING PROCEDURES IN CONNECTION WITH SALE OF INTELLECTUAL PROPERTY, INTERNET-RELATED PROPERTY AND CUSTOMER INFORMATION, (B) AUTHORIZING DEBTOR TO ENTER INTO A STALKING HORSE AGREEMENT IN CONNECTION THEREWITH, (C) APPROVING CERTAIN BID PROTECTIONS IN CONNECTION THEREWITH, (D) APPROVING FORM AND MANNER OF SALE NOTICE AND (E) SETTING AUCTION AND SALE HEARING DATES; (II) AUTHORIZING U.S. TRUSTEE TO APPOINT CONSUMER PRIVACY OMBUDSMAN; (III) APPROVING SALE OF INTELLECTUAL PROPERTY, INTERNETRELATED PROPERTY AND CUSTOMER INFORMATION FREE AND CLEAR OF ALL INTERESTS; AND (IV) GRANTING RELATED RELIEF**

The debtor and debtor in possession in the above-captioned case (the "Debtor"

and/or the "Seller") hereby moves (the "Motion"), pursuant to sections 105, 332 and 363

of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and 6004

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of

orders (I)(A) approving procedures in connection with soliciting bids for a sale (the

"Sale") of certain of the Seller's intellectual property, internet-related property and

customer information (all as more particularly set forth in the Agreement (as defined

herein), the "Intellectual Property and Internet Assets"), (B) authorizing the Seller to enter into a stalking horse agreement in connection with the Sale of the Intellectual Property and Internet Assets, (C) approving certain Bid Protections (as defined below) in connection therewith, (D) approving the form and manner of sale notice (the "Notice Procedures"), and (E) scheduling Auction and Sale Hearing dates (each as defined below); (II) authorizing the U.S. Trustee to appoint a consumer privacy ombudsman; (III) approving the Sale of the Intellectual Property and Internet Assets free and clear of all Interests (as defined below) and (IV) granting related relief. In support of the Motion, the Seller respectfully represents as follows:

## Jurisdiction

1.  This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of this case and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.  The statutory predicates for the relief requested herein are sections 105 and 502 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002(a), 3007, 7004, 9006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 3007-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Rules").

## BACKGROUND

3.  On February 9, 2009 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

4.  The Debtor continues to manage and operate its business as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108.

5.  No trustee or examiner has been appointed in this chapter 11 case.

6.      On February 11, 2009, the Office of the United States Trustee filed a Notice of Appointment of Official Committee of Unsecured Creditors (Docket No. 66), which listed the members of the Official Committee of Unsecured Creditors (the "Committee").

7.      On May 12, 2009, the Court entered an order authorizing the Debtor to conduct auctions for a sale or sales of the Debtor's business as a going concern or for liquidation.  At the conclusion of the auction, the Debtor determined that the highest and otherwise best bid was that of Gordon Brothers Retail Partners, LLC (the "Agent").  On May 20, 2009, the Court approved the Agent's bid and authorized the Debtor to conduct going out of business sales at the Debtor's remaining stores.  The Agent commenced going out of business sales at the Debtor's remaining stores on May 21, 2009.

## RELIEF REQUESTED

8.      By this Motion, the Seller seeks (I) entry of an order, substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order") (A) approving the bidding procedures attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures"), (B) authorizing the Seller to enter into the Asset Purchase Agreement (the "Agreement"), attached to the Bidding Procedures Order as Exhibit 2, by and among the Seller and Buxbaum Holdings, Inc. (the "Purchaser" or the "Stalking Horse Bidder") as a "stalking horse" agreement, (C) authorizing the Seller to provide the Stalking Horse Bidder with certain Bid Protections (as defined below), (D) approving the Notice Procedures and (E) scheduling the Auction for November 10, 2009 and the hearing with respect to any Bid or proposal accepted by the Seller (the "Sale Hearing") for November 20, 2009; (II) entry of an order substantially in the form attached hereto as Exhibit B (the "CPO Order") directing the U.S. Trustee to appoint a consumer privacy ombudsman and

(III) entry of an order, substantially in the form attached hereto as Exhibit C (the "Sale Approval Order") approving the Sale of the Intellectual Property and Internet Assets free and clear of all Interests and granting related relief.

## BASIS FOR RELIEF

9.      In the course of its continued liquidation, the Seller has identified various assets -- including the Intellectual Property and Internet Assets – that are valuable but for which the Seller has no use going forward.  The Seller has thus determined that the sale of the Intellectual Property and Internet Assets would bring significant recovery for the Seller's estate and creditors.

10.      To help ensure that the Seller receives the highest or otherwise best proposal for the Intellectual Property and Internet Assets, the Seller seeks authorization to enter into the Agreement with the Stalking Horse Bidder, and to solicit competing bids in accordance with the Bidding Procedures.

11.      The Seller believes that conducting the Auction with respect to the Intellectual Property and Internet Assets among the Stalking Horse Bidder and any bidders submitting competing offers will enable it to maximize value and minimize expenses incurred.  The Debtors may sell the assets in multiple transactions and aggregate the bids, if appropriate.

## BIDDING PROCEDURES

12.      **The Bid Deadline.** The Seller proposes that bids to purchase any of the Intellectual Property and Internet Assets (the "Bids") be required to be submitted on or before November 6, 2009 at 3:00 p.m. (Eastern) (the "Bid Deadline").  Up until the Bid Deadline, the Seller will accept competing Bids to purchase the Intellectual Property and Internet Assets from those bidders who submit qualified proposals in accordance with the

Bidding Procedures (collectively, the "Qualified Bidders" and such Bids by Qualified Bidders, the "Qualified Bids"). Such competing Bids must exceed the Stalking Horse Bid by a minimum of $20,000 (the "Initial Minimum Overbid").

13. **The Auction.** The Seller proposes that, if it receives any Qualified Bids besides the Stalking Horse Bid, on November 10, 2009 the Seller will hold an auction (the "Auction") among such Qualified Bidders. The Auction will take place at the offices of Tavenner & Beran, 20 North Eighth Street, Second Floor, Richmond, Virginia 23219, beginning at 2:00 p.m. (Eastern) or such later time or other place as the Seller notifies all Qualified Bidders who have submitted Qualified Bids. The Qualified Bidders who wish to participate in an Auction, or their authorized representative, must be present in person or by phone for the Auction.

14. The Seller will commence the Auction with the highest or otherwise best Qualified Bid(s) submitted prior to the Bid Deadline. During the Auction, any Qualified Bidder may submit subsequent Bids (the "Auction Bids"). Each Auction Bid will exceed the previous Bid as announced at the Auction (the "Subsequent Minimum Overbid"). Bidding in the Auction will remain open until all Qualified Bidders, including the Stalking Horse Bidder, have submitted their highest or otherwise best proposal for the Intellectual Property and Internet Assets.

15. **The Successful Bidder(s).** Upon the conclusion of bidding in the Auction, the Seller, after consultation with counsel to the Committee, will determine which proposal provides the Seller, its estate and creditors with the highest or otherwise best offer, taking into account the net value of the offer to the Seller's estate. Finally, the Seller will announce the bidder or bidders submitting the proposal that they have determined constitutes the highest or otherwise best proposal (the "Successful

Bid(s)," and the party submitting the Successful Bid, the "Successful Bidder") and close the Auction.

16.      In qualifying bidders and conducting the Auction, the Seller intends to implement the Bidding Procedures summarized above substantially in the form attached hereto as Exhibit A.  The Seller reserves the right to modify such procedures as necessary or as it deems appropriate, in consultation with counsel to the Committee, to maximize value for its estate and creditors.  The Seller believes that such procedures are appropriate and will maximize the recovery for the Seller and its estate in connection with the Auction.

## THE AGREEMENT

### A.      Marketing Efforts

17.      Since the Petition Date, the Debtor has pursued various restructuring alternatives, including a stand-alone plan, transactions with strategic partners and sales of all or certain aspects of its business. As noted above, these efforts ultimately culminated in the Court's approval of an agency agreement with the Agent (the "Agency Agreement") and the Debtor's liquidation.

18.      In the period leading up to the Court's authorization of the liquidation, the Debtor's and its advisors actively contacted potential purchasers concerning sales of some or all of the assets of the Debtor. In connection therewith, the Debtor received indications of interest in certain of the Debtor's intellectual property and internet-related assets.

19.      Given the Debtor's focus on pursuing a sale of the Debtor's businesses as a going concern, the Debtor did not go forward with these offers at that time. However,

following the Court's approval of the Agency Agreement and liquidation of the Debtor's inventory, the Debtor and its advisors recommenced efforts to market the Intellectual Property and Internet Assets.

20. To that end, the Debtor developed a list of potential purchasers, including (i) certain potential purchasers that had expressed an interest in some or all of the Debtor's intellectual property and internet related assets during the earlier sale process, and (ii) parties that expressed an interest in some or all of the Debtor's intellectual property and internet-related assets in the period following approval of the liquidation.

21. The Stalking Horse Bidder presented an offer, which offer was shared with the Committee. Thereafter, negotiations ensued. The negotiations revolved around transaction structure, price, assets to be sold, and contractual arrangements.

22. These negotiations culminated in the signing of the Agreement with the Purchaser on October 9, 2009 for the purchase of the Intellectual Property and Internet Assets.

23. The Debtor intends to continue to market its intellectual property and internet related assets, including soliciting bids for the Intellectual Property and Internet Assets upon approval of the Bidding Procedures Order with the assistance of Streambank, LLC ("Streambank").[1]

**B.    The Agreement.**

24. Pursuant to the Agreement, the Seller has agreed to sell the Intellectual Property and Internet Assets to the Purchaser for $165,000.00 (the "Purchase Price"), subject to higher or otherwise better proposals and this Court's approval.

**C.    Bid Protections.**

---

[1] The Debtor has previously filed an application to employ Streambank.

25.     The Purchaser has expended, and likely will continue to expend, time, money, and energy pursuing the Sale and has engaged in extended arm's length and good faith negotiations regarding a possible purchase of the Intellectual Property and Internet Assets. The Agreement is the culmination of these efforts.

26.     In recognition of this expenditure of time, energy, and resources, the Seller has agreed to provide certain bid protections to the Purchaser, including the Break-Up Fee (the "Bid Protections"). Specifically, the Agreement provides for, and the Seller respectfully requests that the Bidding Procedures Order approve, the Break-Up Fee payable by the Seller to the Purchaser in the amount of $10,000 if (i) the Seller terminates the Agreement to close an alternative transaction and closes an alternative transaction, so long as the Purchaser is not in breach of the Agreement or (ii) the Seller terminates the bidding and auction process.

28.     The Seller believes that the proposed Bid Protections are fair and reasonable in view of (a) the analysis, due diligence investigation, and negotiation undertaken by the Purchaser in connection with the Sale and (b) the fact that the Purchaser's efforts would maximize the value of the Intellectual Property and Internet Assets for the benefit of all stakeholders, whether as a result of consummating the Sale pursuant to the Agreement or by generating a higher or otherwise better offer pursuant to the Bidding Procedures.

29.     The Purchaser is unwilling to keep open its offer to purchase the Intellectual Property and Internet Assets under the terms of the Agreement unless this Court authorizes payment of the Bid Protections. Thus, absent entry of the Bidding Procedures Order and approval of the Bid Protections, the Seller may lose the opportunity to obtain what they believe to be the highest and best offer for the Intellectual Property

and Internet Assets. The Auction, moreover, is a competitive mechanism designed to test whether any alternative use for the Intellectual Property and Internet Assets would yield a higher or better return for the Seller. Approving the Bid Protections will thus commit the Purchaser to serve as the Stalking Horse Bidder under the Agreement, and the Purchaser's bid would serve to start any additional bidding for the Intellectual Property and Internet Assets at a fair and reasonable purchase price.

30.     Moreover, payment of the Break-Up Fee will not diminish the Seller's estate. The Seller would not be obligated to pay the Break-Up Fee unless either (i) it does so to accept an alternative Successful Bid, which would result in even greater value to the Seller's estate and its stakeholders or (ii) it opts to terminate the bidding and auction process. This is particularly true given the Initial Minimum Overbid requirement, which ensures that Auction Bids represent higher or otherwise better offers for the Intellectual Property and Internet Assets, taking into account payment of the Bid Protections. The Seller thus requests that this Court authorize payment of the Bid Protections pursuant to the terms and conditions of the Agreement.

## APPOINTMENT OF A CONSUMER PRIVACY OMBUDSMAN

31.     The Seller and the Purchaser agree to use their reasonable best efforts to satisfy and otherwise address matters relating to the conveyance of any personally identifiable information (the "PII") as identified by a consumer privacy ombudsman (the "CPO"). Accordingly, the Seller requests that the Court order the U.S. Trustee to appoint a CPO pursuant to, and as defined by, Bankruptcy Code sections 332 and 363(b)(1)(B). The Seller believes that the appointment of a CPO will ensure the protection of any PII included in the Intellectual Property and Internet Assets.

## THE SALE OF CUSTOMER INFORMATION

32.     Pursuant to the Agreement, and subject to Court approval, the Seller has agreed to sell and the Purchaser has agreed to purchase the Intellectual Property and Internet Assets, including any PII included therein. With respect to the transfer of the any PII from the Seller to the Purchaser, the Purchaser has expressly agreed to the restrictions set forth in Section 5.4 of the Agreement, which are designed to safeguard PII.

33.     Accordingly, the Seller requests that the Court approve the Sale. As discussed further below, the Seller believes a sale, with the above protections, will adequately protect PII, complies with the Bankruptcy Code and is in the best interests of the Seller and its estate and creditors.

**NOTICE PROCEDURES**

34.     Within five (5) days after entry of the Bidding Procedures Order (the "Mailing Date"), the Seller (or its agent) proposes to serve the Motion, the Agreement, the Bidding Procedures, the Bidding Procedures Order and the proposed Sale Approval Order by electronic mail, if possible, or first-class mail, postage prepaid, upon (i) all entities known to have expressed an interest in a transaction with respect to the Intellectual Property and Internet Assets during the past three (3) months, (ii) all entities known to have asserted any Lien upon the Intellectual Property and Internet Assets, (iii) all federal, state, and local regulatory or taxing authorities or recording offices, which have a reasonably known interest in the relief requested by the Motion and (iv) all parties entitled to notice under the Order Granting Motion to Authorize Certain Notice, Case Management, and Administrative Procedures (D.I. 51; the "Case Management Order").

35.     The Seller also proposes, pursuant to Bankruptcy Rule 2002(l) and 2002(d) to publish notice of the Sale in the Wall Street Journal within five (5) days of entry of the Bidding Procedures Order or as soon as practicable thereafter. The Seller

requests that such publication notice be deemed proper notice to any other interested parties whose identities are unknown to the Seller.

## APPLICABLE AUTHORITY

### I. THE BIDDING PROCEDURES ARE REASONABLE AND APPROPRIATE.

36.     Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Moreover, Bankruptcy Code section 105(a) provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

37.     The Seller believes that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding and auction process is fair and reasonable and will yield the maximum value for their estates and creditors. The Bidding Procedures permit the Seller to maximize the value of the Intellectual Property and Internet Assets. In addition, the Bidding Procedures set deadlines for conducting the Auction and holding the Sale Hearing with respect to the transactions proposed herein.

38.     Accordingly, the Seller believes the Court should approve the Bidding Procedures, including the dates established thereby for, inter alia, the Bid Deadline, the Auction and the Sale Hearing. Similar procedures have been previously approved by this Court in other cases. See, e.g., In re Circuit City Stores, Inc., Case No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 11, 2008) In re The Rowe Companies, Case No. 06-11142 (SSM) (Bankr. E.D. Va. Dec. 20, 2006); In re Ceyoniq, Inc., Case No. 02-85887 (RGM) (Bankr. E.D. Va. Jan. 30, 2003).

### II. THE BID PROTECTIONS REQUESTED HEREIN ARE REASONABLE AND SHOULD BE APPROVED.

39.     In connection with Sale of the Intellectual Property and Internet Assets, the Court should authorize the Seller to pay the Break-Up Fee identified herein.

40.     Agreements to provide break-up fees and other bidding incentives are designed to compensate a potential acquirer who serves as a catalyst that may attract higher and better offers, and have been approved in bankruptcy to encourage bidding. See In re Ryan, 261 B.R. 867, 870 (Bankr. E.D. Va. 2001). Break-up fees can be advantageous to both buyers and sellers because they encourage bidding to ensure that sellers receive the highest or otherwise best offer while compensating the buyer for the risk of being outbid. See id.

41.     Break-up fees are allowed as an administrative expense claim against the estate if they satisfy the standard of section 503(b)(1). In re Tropea, 352 B.R. 766, 768 (Bankr. N.D.W.Va. 2006). Thus, the fee must reflect the actual and necessary cost of preserving the estate. See 11 U.S.C. § 503(b)(1). See also In re Tropea, 352 B.R. at 768. In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit explained how the section 503(b)(1) standard applied to breakup fees. The Third Circuit Court of Appeals held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some post petition benefit to the debtor's estate. See id. at 533; see also In re Lamb, 2002 WL 31508913 (Bankr. D. Md. 2002) (implicitly adopting the administrative expense standard set forth in O'Brien).

42.     The O'Brien Court identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537.  Second, when the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

43.     Here, the Seller seeks authority to utilize the Bid Protections in the event that the Purchaser is not ultimately the Successful Bidder. The proposed Bid Protections, including the Break-Up Fee, are appropriate under Bankruptcy Code section 503. The Bid Protections are fair and reasonable in amount, particularly in view of the efforts that will have to be expended by the Purchaser. Moreover, the Agreement, including the Bid Protections provided for therein, will enable the Seller to secure an adequate floor for the Auction and, thus, insist that competing bids be materially higher or otherwise better than the Stalking Horse Bid (as incorporated in the Initial Minimum Overbid requirement), a clear benefit to the Seller's estate.

44.     In sum, the Seller's ability to offer the Bid Protections enables them to ensure the Sale of the Intellectual Property and Internet Assets to a contractually-committed bidder at a price that they believe to be fair while, at the same time, providing them with the potential of even greater benefit to the estates. Thus, the Bid Protections should be approved.

**III.     APPROVAL OF THE SALE OF THE INTELLECTUAL PROPERTY AND**

**INTERNET ASSETS IS WARRANTED UNDER BANKRUPTCY CODE SECTIONS 105(A) AND 363(B)(1).**

45.     As set forth above, Bankruptcy Code section 363(b)(1) authorizes a trustee to "use, sell, or lease" property of the estate with the Court's approval. 11 U.S.C. § 363(b)(1). Assets of the Seller may be sold outside of the ordinary course of business, pursuant to Bankruptcy Code section 363(b)(1), if a sound business purpose exists for doing so. In re WBQ P'ship, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)(citing Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986)); see also In re W.A. Mallory Co., Inc., 214 B.R. 834, 836 (Bankr. E.D. Va. 1997).

46.     To satisfy the "sound business purpose test," the debtor must demonstrate that (1) a sound business reason or emergency justifies a pre-confirmation sale; (2) the sale was proposed in good faith; (3) the purchase price is fair and reasonable; and, (4) adequate and reasonable notice of the sale has been provided. In re WBQ P'ship, 189 B.R. at 102.

47.     Based upon the results of its analysis, the Seller's management and advisors have concluded that the sale of the Intellectual Property and Internet Assets to the Purchaser or the Successful Bidder in accordance with the procedures set forth in the Bidding Procedures will maximize recoveries to the estate and stop deterioration (if any) of the value of the Intellectual Property and Internet Assets.  Maximizing asset value and preventing deterioration are sound business purposes that warrant authorizing the proposed Sale.

48.     The Sale of the Intellectual Property and Internet Assets will be subject to competing bids, thereby enhancing the Seller's ability to receive the highest or otherwise best value for the Intellectual Property and Internet Assets. Consequently, the fairness and

reasonableness of the consideration to be received by the Seller will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

49.     Moreover, pursuant to the Notice Procedures, all creditors and parties in interest will receive adequate notice under the circumstances of the Bidding Procedures and the Sale Hearing. In light of the circumstances, such notice is reasonably calculated to provide timely and adequate notice to the Seller's major creditor constituencies, those parties most interested in these cases, those parties potentially interested in bidding on the Intellectual Property and Internet Assets, and others whose interests are potentially implicated by the proposed Sale.

## IV.     THE APPOINTMENT OF A CPO IS WARRANTED UNDER BANKRUPTCY CODE SECTION 332

50.     Bankruptcy Code section 332 provides, in part, that:

> If a hearing is required under section 363(b)(1)(B), the court shall order the United States trustee to appoint, not later than 5 days before the commencement of the hearing, 1 disinterested person... to serve as the consumer privacy ombudsman in the case . . . .

11 U.S.C. § 332(a). Bankruptcy Code section 332(b) further provides that the CPO may appear and be heard at the hearing and "shall provide to the court information to assist the court in its consideration of the facts, circumstances and conditions of the proposed sale" of PII. 11 U.S.C. § 332(b).

51.     Here, the Seller is proposing to sell the Intellectual Property and Internet Assets pursuant to Bankruptcy Code section 363(b)(1)(B). Thus, the Court should order the U.S. Trustee to appoint a CPO to assist the Court in its consideration of the sale set forth in the Agreement.

52.     CPOs has been appointed by Courts in this district and elsewhere in connection with sales of PII. See, e.g., In re Circuit City Stores, Inc., Case No. 08-35653 (KRH) (Bankr. E.D. Va 2008); In re Storehouse, Inc., Case No. 06-11144 (SSM) (Bankr. E.D. Va. 2006); In re Foxtons, Inc., Case No. 07-24496 (MBK)(Bankr. D.N.J. 2007); In re Three A's Holdings, LLC, Case No. 06-10886 (BLS)(Bankr. D. Del. 2006); In re Refco, Inc., Case No. 06-60006 (DD)(Bankr. S.D.N.Y. 2005).

53.     Accordingly, the Debtor requests that the Court order the U.S. Trustee to appoint a CPO in this chapter 11 case in connection with the sale of any PII.

## V.     THE SALE IS APPROPRIATE UNDER BANKRUPTCY CODE SECTION 363(b)(1).

54.     Section 363(b)(1) provides that a debtor may sell property outside of the ordinary course of business with court approval. 11 U.S.C. § 363(b)(1). Where such a sale contemplates the transfer of "personally identifiable information" and the debtor has a privacy policy pertaining to such information as of the commencement of the case, the debtor must satisfy subsections (b)(1)(A) or (b)(1)(B).

55.     Bankruptcy Code section 363(b)(1)(A) authorizes a sale if the applicable privacy policy permits the sale or transfer of PII. 11 U.S.C. § 363(b)(1)(A). By contrast, if the privacy policy does not permit the sale or transfer of personally identifiable information, the Court may approve the sale or transfer if two conditions are satisfied.

56.     First, the Court must consider the facts, circumstances and conditions of such sale or transfer. 11 U.S.C. § 363(b)(1)(B)(i). Second, the Court must determine that such sale or transfer does not violate applicable nonbankruptcy law. 11 U.S.C. § 363(b)(1)(B)(ii).

57.     More particularly, Bankruptcy Code section 363(b)(1)(B) provides, in

relevant part, that:

> "[I]f the debtor in connection with offering a product or a service discloses
> to an individual a policy prohibiting the transfer of personally identifiable
> information about individuals to persons that are not affiliated with the
> debtor and if such policy is in effect on the date of commencement of the
> case, then the trustee may not sell or lease personally identifiable
> information to any person unless –
>
> ...
>
> (B) after appointment of a consumer privacy ombudsman in accordance
> with section 332, and after notice and a hearing, the court approves such
> sale or such lease – (i) giving due consideration to the facts, circumstances
> and conditions of such sale or such lease; and (ii) finding that no showing
> was made that such sale or such lease would violate applicable
> nonbankruptcy law.

11 U.S.C. § 363(b)(1).

58.     Here, the Debtor is proposing to sell all customer information related

property (including without limitation customer lists, mailing lists and customer database)

in readily accessible, readable and usable formats, which information was protected by a

certain privacy policy (the "Privacy Policy").

59.     As noted above, the PII was subject to the Privacy Policy. Thus, the sale or

transfer of such data must satisfy Bankruptcy Code section 363(b)(1)(A) or (B). Guided

by this section, the Bankruptcy Court for the Eastern District of Virginia has previously

approved the sale of PII in In re Circuit City Stores, Inc., Case No. 08-35653 (Bankr.

E.D. Va. Nov. 10, 2008) and In re Storehouse, Inc., Case No. 06-11144 (SSM)(Bankr.

E.D. Va. Sep. 11, 2007). In Circuit City and Storehouse, the Courts approved the transfer

of PII with the following conditions:

(a)     The purchaser must be in materially the same line of business as seller;

(b)     The purchaser must use the PII consumer records for the same purpose(s) as are specified in the applicable privacy policy;

(c)     The purchaser must agree to comply with the applicable privacy policy and its specified policies and practices;

(d)     The purchaser must agree that prior to making any "material change" to the applicable privacy policy, or the use or disclosure of personal information different from that specified in such privacy policy, the purchaser will notify all consumers and offer them an opportunity to "opt out" of the changes to those policies or the new uses of their personal information;

(e)     The purchaser must agree to employ appropriate information controls and procedures (technical, operational and managerial) to protect the personally identifiable consumer information; and

(f)     The purchaser must agree to abide my any applicable state privacy and data breach law.

Id. (the "Privacy Conditions").

61.     With these conditions in place, this Court approved the sale and license of the PII under Bankruptcy Code section 363(b)(1)(B)(i) and (ii) based on the "facts, circumstances and conditions" of such sale.

62.     Here, the Purchaser has agreed, and any Successful Bidder would agree, to comply with substantially all of the Privacy Conditions. Specifically, the Purchaser has agreed (at a minimum) (a) to adopt and comply with the Privacy Policy; (b) to use PII for the same purpose(s) as are specified in the Privacy Policy; (c) that, prior to making any material change to the Privacy Policy or the use or disclosure of PII different from that specified in the Privacy Policy, Purchaser will notify the persons whose PII is included by mail or email and afford such persons the opportunity to opt-out of the changes to the Privacy Policy or the new uses of the data provided in the "opt-out" communication the Purchaser may simultaneously provide information about the Purchaser and its affiliates; (d) to employ appropriate information security controls and procedures (technical,

operational, and managerial) to protect the data; (e) to abide by all applicable US laws and regulations.

63.     Thus, a sale of the PII to the Purchaser or the Successful Bidder would comply with substantially all of the Privacy Conditions.  Accordingly, the Debtor believes that, pursuant to Bankruptcy Code section 363(b)(1)(B), the facts, circumstances and conditions of the sale are such that the sale should be approved.

## VI.     THE PURCHASER IS OR SUCCESSFUL BIDDER WOULD BE A GOOD FAITH PURCHASER PURSUANT TO BANKRUPTCY CODE SECTION 363(M) AND THE TRANSACTION CONTEMPLATED BY THE AGREEMENT SHOULD CARRY THE PROTECTIONS OF BANKRUPTCYCODE SECTION 363(N).

64.     Bankruptcy Code section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Fourth Circuit Court of Appeals has "adopt[ed] the traditional equitable definition that has been adopted by various courts of appeal: 'one who purchases the assets for value, in good faith, and without notice of adverse claims.'" Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985)(citations omitted).

65.     Bankruptcy Code section 363(n) further provides, in relevant part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.

11 U.S.C. § 363(n).

66.     The Seller submits, and will present evidence at the Sale Hearing, that the Agreement reflects an intensely negotiated, arm's length transaction. Throughout the negotiations, the Purchaser has at all times acted in good faith. Moreover, to the extent that the assets are sold to a Successful Bidder, it will be because of a well-planned competitive process and arm's length negotiations. Additionally, the Bidding Procedures ensure that a prospective purchaser will not be able to exert any undue influence over the Seller. Moreover, the Purchaser's is or Successful Bidder's bid will not be the product of fraud or collusion between the Purchaser or Successful Bidder and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

67.     As a result of the foregoing, the Seller requests that the Court make a finding that the purchase price to be paid by the Purchaser or the Successful Bidder constitutes reasonably equivalent value and fair consideration under any applicable law. The Seller further requests that this Court make a finding that the Purchaser or the Successful Bidder, as the case may be, has purchased the Intellectual Property and Internet Assets in good faith within the meaning of Bankruptcy Code section 363(m). Additionally, the Seller requests that this Court make a finding that a purchase agreement reached as a result of the Bidding Procedures necessarily will comprise an arm's length, intensely negotiated transaction entitled to the protections of Bankruptcy Code section 363(m) and that the transactions contemplated by the Agreement are not avoidable under Bankruptcy Code section 363(n).

**VII.    THE SALE OF THE INTELLECTUAL PROPERTY AND INTERNET ASSETS SHOULD BE FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES UNDER BANKRUPTCY CODE SECTION 363(f).**

68.     To facilitate a sale of the Intellectual Property and Internet Assets, the

Seller requests authorization to sell the Intellectual Property and Internet Assets free and

clear of any and all Interests.

69.     Under Bankruptcy Code section 363(f), a debtor in possession may sell

property free and clear of any interest in such property if, among other things:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear
>         of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is sold is greater
>         than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to
>         accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

70.     Section 363(f) permits the sale of estate property free and clear of interests

if any one of the five conditions above is met. See, e.g., In re Laines, 352 B.R.

410, 414-15 (Bankr. E.D. Va. 2005).

71.     Courts have held that the authority of a debtor to sell assets free and clear

of interests is broad and should be read expansively. See In re TWA, Inc., 322 F.3d 283,

289 (3d Cir. 2003); see also United Mine Workers of Am. 1992 Benefit Plan v. Leckie

Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99 F.3d 573, 582 (4th Cir. W.

Va. 1996) (holding that the phrase "any interest in property" includes more than just in

rem interests); In re P.K.R. Convalescent Centers, Inc., 189 B.R. 90, 94 (Bankr. E.D. Va.

1995)("As the plain meaning of the statute demonstrates, § 363 covers more situations

than just sales involving liens."). Moreover, courts have noted that the purpose of the

"free and clear" language is to allow the debtor to obtain a maximum recovery on its assets in the marketplace. See In re TWA, Inc., 2001 Bankr. LEXIS 723, at *8-*10 (Bankr. D. Del. Mar. 27, 2001).

72.     Accordingly, this Court should authorize the Seller to sell the Intellectual Property and Internet Assets free and clear of all Interests, with any such Interests attaching to the net proceeds of the sale of the Intellectual Property and Internet Assets in the same order and priority as they exist against the Intellectual Property and Internet Assets.  The Seller is aware of no such liens.

## VIII.   THE TEN-DAY STAY PROVIDED BY BANKRUPTCY RULE 6004 SHOULD BE WAIVED FOR ANY ORDER APPROVING THE SALE OF THE INTELLECTUAL PROPERTY AND INTERNET ASSETS.

73.     Bankruptcy Rule 6004(h) provides that: "[a]n order authorizing the use, sale, or lease of property is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

74.     The Seller requests that the Court waive the ten-day stays of Bankruptcy Rule 6004 with respect to the Sale of the Intellectual Property and Internet Assets following entry of any and all orders approving such transactions.  By waiving such requirement, the Seller and any purchaser will be able to immediately close the transactions approved by such orders, which will in turn save the Seller continued accrual of administrative expenses and thereby benefit the Seller's estate.

## WAIVER OF MEMORANDUM OF LAW

75.     Pursuant to Local Bankruptcy Rule 9013- 1(G), and because there are no novel issues of law presented in the Motion and all applicable authority is set forth in the Motion, the Debtor requests that the requirement that all motions be accompanied by a separate memorandum of law be waived.

## NO PRIOR REQUEST

76.     No previous request for the relief sought herein has been made to this

Court or any other court.

## CONCLUSION

WHEREFORE, the Seller respectfully requests that the Court (i) enter the

Bidding Procedures Order, substantially in the form annexed hereto, (ii) enter the CPO

Order, substantially in the form annexed hereto, (iii) following completion of the

Auction, enter the Sale Approval Order, substantially in the form annexed hereto and (iv)

grant such other and further relief as may be just and proper.


Dated: October 14, 2009
            Richmond, Virginia

_____*/s/ Paula S. Beran*_____
Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
TAVENNER & BERAN, PLC
20 North 8th Street, Second Floor
Richmond, Virginia 23219
(804) 783-8300

Attorneys for the Debtor in Possession

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing Debtor's Motion For Entry of orders (I)(A) approving procedures in connection with soliciting bids for a sale of certain of the Seller's intellectual property, internet-related property and customer information (all as more particularly set forth in the Agreement, (B) authorizing the Seller to enter into a stalking horse agreement in connection with the Sale of the Intellectual Property and Internet Assets, (C) approving certain Bid Protections in connection therewith, (D) approving the form and manner of sale notice , and (E) scheduling Auction and Sale Hearing dates; (II) authorizing the U.S. Trustee to appoint a consumer privacy ombudsman; (III) approving the Sale of the Intellectual Property and Internet Assets free and clear of all Interests and (IV) granting related relief was served via United States mail, first-class, postage prepaid and/or by electronic delivery to all of the parties on the Primary Service List (as defined in the Case Management Order) on the 14th day of October, 2009.


_____/s/ Paula S. Beran_____
Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
TAVENNER & BERAN, PLC
20 North 8th Street, Second Floor
Richmond, Virginia 23219
(804) 783-8300