Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
TAVENNER & BERAN, PLC
20 North 8th Street, Second Floor
Richmond, Virginia 23219
(804) 783-8300
Attorneys for the Debtor in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

--------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| S & K Famous Brands, Inc., | : | Case No. 09-30805 (KRH) |
| | : | |
| Debtor. | : | |

--------------------------------------------------------x

## ORDER (I) APPROVING SALE OF INTELLECTUAL PROPERTY, INTERNET-RELATED PROPERTY AND CUSTOMER INFORMATION FREE AND CLEAR OF ALL INTERESTS AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[1] of S & K Famous Brands, Inc., (the "Seller" and with the debtor and debtor in possession in the above-captioned case, the "Debtor"), for entry of orders under Bankruptcy Code sections 105, 332 and 363 and Bankruptcy Rules 2002 and 6004, (I)(A) approving procedures in connection with soliciting bids for a sale (the "Sale") of certain of the Seller intellectual property, Internet-related property and customer information (collectively the "Intellectual Property and Internet Assets"), (B) authorizing the Seller to enter into a stalking horse agreement in connection therewith, (C) approving certain Bid Protections in connection therewith, (D) approving the form and manner of sale notice and (E) scheduling Auction and Sale Hearing dates

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

(each as defined below); (II) authorizing the U.S. Trustee to appoint a consumer privacy ombudsman (the "CPO"); (III) approving the Sale of the Intellectual Property and Internet Assets free and clear of all Interests and (IV) granting related relief; and the Court having conducted a hearing on the Motion on November 20, 2009 (the "Sale Hearing"); and all parties in interest having been heard, or having had the opportunity to be heard, regarding the agreement, as amended, attached hereto as Exhibit 1 (the "Agreement"), by and among the Seller and Buxbaum Holdings, Inc. (together with the designee of Buxbaum Holdings, Inc. , the "Purchaser") and the transactions contemplated thereby (collectively, the "Transactions"); and the Court having reviewed the Transactions; and the Court having reviewed and considered the Motion, the Agreement, the Transactions and the arguments of counsel made, and the evidence adduced, at the Sale Hearing; and upon the record of the Sale Hearing and this chapter 11 case, and after due deliberation thereon, and good cause appearing therefore it is hereby

**FOUND AND DETERMINED THAT:[2]**

A.    The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).

B.    Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

C.    The statutory predicates for the relief requested in the Motion are

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

Bankruptcy Code sections 105, 332 and 363 and Bankruptcy Rules 2002 and 6004.

D.      Notice of the Motion and entry of the Sale Order has been provided to (A)(i) all entities known to have expressed an interest in a transaction with respect to the Intellectual Property and Internet Assets during the past three (3) months, (ii) all entities known to have asserted any Lien upon the Intellectual Property and Internet Assets, (iii) all federal, state, and local regulatory or taxing authorities or recording offices, which have a reasonably known interest in the relief requested by the Motion and (iv) all parties entitled to notice under the Order Granting Motion Of The Debtor Pursuant to Bankruptcy Code Sections 102 and 105, Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1 Establishing Certain Notice, Case Management, and Administrative Procedures (D.I. 51; the "Case Management Order") and (B) other parties through publication of the Sale Notice, all in accordance with and as provided by the Bidding Procedures Order.

E.      Based upon the affidavits of service and publication filed with the Court: (a) notice of the Motion and the Sale Hearing was adequate and sufficient under the circumstances of this chapter 11 case and these proceedings and complied with the various applicable requirements of the Bankruptcy Code and the Bankruptcy Rules and the Bidding Procedures Order; and (b) a reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein was afforded (or will be afforded) to all interested persons and entities. Under the circumstances, good and sufficient notice of the Transactions has been given to all necessary parties.

F.      The Intellectual Property and Internet Assets are property of the Seller's estate and title thereto is vested in the Seller's estate.

G.     The Seller and its professionals marketed the Intellectual Property and Internet Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Intellectual Property and Internet Assets.

H.     Pursuant to the Bidding Procedures,  the Seller determined that the highest and best Qualified Bid was that of Purchaser.

I.     Subject to the entry of this Order, the Seller (i) has full power and authority to execute the Agreement and all other documents contemplated thereby, and the sale of the Intellectual Property and Internet Assets by the Seller has been duly and validly authorized by all necessary company action of each of the Seller, (ii) has all of the power and authority necessary to consummate the Transactions contemplated by the Agreement , (iii) has taken all company action necessary to authorize and approve the Agreement and the consummation by the Seller of the Transactions. No consents or approvals, other than those expressly provided for in the Agreement or this Order, are required for the Seller to close the Sale and consummate the Transactions.

J.     The Agreement and the Transactions were negotiated and have been and are undertaken by the Seller and the Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of Sections 363(m) of the Bankruptcy Code.

K.     The total consideration provided by the Purchaser for the Intellectual Property and Internet Assets is the highest and best offer received by the Seller, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform

Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia ((a), (b) and (c) collectively, "Value"), for the Intellectual Property and Internet Assets.

L.     The Purchaser would not have entered into the Agreement and would not consummate the Transactions, thus adversely affecting the Seller, its estate and creditors, if the sale of the Intellectual Property and Internet Assets to the Purchaser was not free and clear of all Interests (as defined in the Agreement), if the Purchaser would, or in the future could, be liable for any of such Interests, or if the transactions contemplated by the Agreement were not consummated. A sale of the Intellectual Property and Internet Assets other than one free and clear of all Interests would adversely impact the Seller's estates, and would yield substantially less Value for the Debtor's estates, with less certainty than the Sale. Therefore, consummation of the Transactions is in the best interests of the Seller, its estate and creditors, and all other parties in interest.

M.     The Seller may sell the Intellectual Property and Internet Assets free and clear of all Interests, because, with respect to each creditor asserting a Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of Interests who did not object or who withdrew its objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2). Those holders of Interests who did object fall within one or more of the other subsections of Bankruptcy Code Section 363(f).

N.     Neither the Seller nor the Purchaser engaged in any conduct that would cause or permit the Agreement or the consummation of the Transactions to be avoided, or

costs or damages to be imposed, under Section 363(n) of the Bankruptcy Code.

O.      The Purchaser is not holding itself out to the public as a continuation of the Seller and is not an "insider" or "affiliate" of Debtor.

P.      Entry into the Agreement and consummation of the Transactions constitute the exercise by the Seller of sound business judgment and such acts are in the best interests of the Seller, its estate and creditors, and all other parties in interest. The Court finds that the Seller has articulated good and sufficient business reasons justifying the Sale of the Intellectual Property and Internet Assets to Purchaser. Such business reasons include, but are not limited to, the following: (i) the Agreement constitutes the highest and best offer for the Intellectual Property and Internet Assets; (ii) the Agreement and the closing thereon will present the best opportunity to realize the value of the Intellectual Property and Internet Assets and avoid decline and devaluation of the Intellectual Property and Internet Assets; (iii) there is substantial risk of deterioration of the value of the Intellectual Property and Internet Assets if the Sale is not consummated promptly; and (iv) the Agreement and the closing thereon will provide a greater recovery for the Seller's creditors than would be provided by any other presently available alternative.

Q.      The Court previously determined that the Sale is consistent with the Privacy Policy, as provided in section 5.4 of the Agreement, and, therefore, the PII may be sold pursuant to § 363 without the necessity of the appointment of a consumer privacy ombudsman.

R.      Furthermore, there has been no showing that the transfer of the PII provided for herein violates any federal, state, international, and any other applicable

nonbankruptcy laws, including (without limitation) laws prohibiting unfair or deceptive practices "UDAP," data breach, privacy, "do-not-call," and "no spam" laws. Accordingly, the sale satisfies the requirements of bankruptcy code section 363(b)(1)(B)(ii) if applicable.

S.　　Time is of the essence in consummating the Sale. In order to maximize the value of the Seller's assets, it is essential that the sale of the Intellectual Property and Internet Assets occur within the time constraints set forth in the Agreement. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rule 6004 with respect to the Transactions.

T.　　The Sale contemplated by the Agreement and the Transactions are in the best interests of the Debtor and its estate, creditors, interest holders and all other parties in interest herein; and it is therefore

**ORDERED, ADJUDGED AND DECREED THAT:**

1.　　The relief requested in the Motion is GRANTED.

2.　　Pursuant to Bankruptcy Code sections 105 and 363, the Agreement and the Transactions are hereby approved and authorized in all respects, unless otherwise ordered herein.

3.　　Pursuant to Bankruptcy Code sections 363(b) and 363(f), upon the consummation of Transactions, the Seller's' right, title, and interest in the Intellectual Property and Internet Assets shall be transferred to the Purchaser free and clear of all interests, including (without limitation) all liens, pledges, mortgages, security interests, charges, easements, leases, subleases, covenants, rights of way, options, claims, restrictions or encumbrances of any kind, whether arising by contract or by operation of

law (the "Liens"), and all debts, adverse claims, liabilities, commitments, responsibilities

and obligations of any kind or nature whatsoever, direct, indirect, absolute or contingent,

matured or unmatured, whether accrued, vested or otherwise, whether known or

unknown, foreseen or unforeseen, and whether or not actually reflected, or required to be

reflected, in a party's balance sheets or other books and records (the "Liabilities" and

together with the Liens, the "Interests").

5.      Except as may be expressly provided in the Agreement, Purchaser is not

assuming nor shall it or any affiliate of Purchaser be in any way liable or responsible, as a

successor or otherwise, for any liabilities, debts, or obligations of the Seller in any way

whatsoever relating to or arising from the Seller's' ownership or use of the Intellectual

Property and Internet Assets prior to the consummation of the Transaction contemplated

by the Agreement, or any liabilities calculable by reference to the Seller or the

Intellectual Property and Internet Assets, or relating to continuing or other conditions

existing on or prior to the Closing.

6.      The Transactions were undertaken by the Purchaser in good faith and the

Purchaser is a good faith purchaser of the Intellectual Property and Internet Assets as that

term is used in Bankruptcy Code section 363(m). The Purchaser is entitled to all of the

protections afforded by Section 363(m) of the Bankruptcy Code.

7.      Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtor and

the Purchaser are each hereby authorized to take any and all actions necessary or

appropriate to: (i) consummate the Transactions including the Sale of the Intellectual

Property and Internet Assets to Purchaser and the Closing of the Sale in accordance with

the Motion, the Agreement and this Order; and (ii) perform, consummate, implement and

close fully the Agreement and Transactions together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement.

8.    With respect to the transfer of the PII, the Purchaser shall:

a.    comply with the S & K Privacy Policy ("S & K Privacy Policy"), attached as Schedule 5.4 to the Agreement, to the extent set forth herein, without determining whether it is required under the Bankruptcy Code.

b.    prior to making any material change to the S & K Privacy Policy or the use or disclosure of PII different from that specified in the S & K Privacy Policy, notify the persons whose PII is involved by mail or email (if available), as appropriate and in the Purchaser's sole discretion as to which method of notification to be used, and afford such persons the opportunity to opt out of the changes to the S & K Privacy Policy or the new uses of its data.  Notwithstanding the foregoing, when delivering the initial "opt out" opportunity, the Purchaser may simultaneously provide information with respect to the Purchaser and its affiliates, including product advertisement and promotion;

g.    employ appropriate information security controls and procedures (technical, operational, and managerial) to protect the PII; and

h.    abide by any applicable state privacy and data breach law.

12.    This Order is and shall be binding upon and govern the acts of all entities, including, all filing agents, filing officers, title agents, title companies, recorders of

mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of its office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Intellectual Property and Internet Assets conveyed to Purchaser. All such entities described above in this paragraph are authorized and specifically directed to strike all recorded Interests against the Intellectual Property and Internet Assets from its records, official and otherwise.

13.     Each and every federal, state and governmental agency or department, and any other person or entity, is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions.

14.     This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rule 6004(h) or any other provision of the Bankruptcy Code or Bankruptcy Rules is expressly lifted.

15.     The Agreement and any related agreements, documents or instruments may be modified or supplemented by the parties thereto in accordance with the terms thereof, without further order of this Court, to the extent such modification is not material.

16.     Except as provided in this Order, to the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in this chapter 11 case, the terms of this Order shall govern. Except as provided in this Order, to the extent there is any inconsistency between the terms of this Order and the terms of the Agreement

(including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

17.     The Court retains jurisdiction, even after the closing of this chapter 11 case, to: (1) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and the terms of the Agreement, all amendments thereto and any waivers and consents thereunder; (2) protect the Purchaser, or the Intellectual Property and Internet Assets, from and against any of the Interests; (3) compel delivery of all Intellectual Property and Internet Assets to Purchaser; and (4) resolve any disputes arising under or related to the Agreement, the Sale or the Transactions or Purchaser's peaceful use and enjoyment of the Intellectual Property and Internet Assets.

Dated: December  __, 2009
Richmond, Virginia

_____
United States Bankruptcy Judge

We ask for this:


_____/s/ Paula S. Beran_____
Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
TAVENNER & BERAN, PLC
20 North 8th Street, Second Floor
Richmond, Virginia 23219
(804) 783-8300

Attorneys for the Debtor in Possession

**CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Paula S. Beran
Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
TAVENNER & BERAN, PLC
20 North 8th Street, Second Floor
Richmond, Virginia 23219
(804) 783-8300

Attorneys for the Debtor in Possession

## EXHIBIT 1

**(Agreement)**

# ASSET PURCHASE AGREEMENT

**Dated as of  October_____, 2009**

**between**

**S& K Famous Brands, Inc.**

**and**

**Buxbaum Holdings, Inc.. d\b\a Buxbaum Group**

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is entered into on October ___, 2009 by and between S&K Famous Brands, Inc., as Debtor and Debtor in Possession (the "Seller" and/or the "Debtor") in bankruptcy case number 09-30805 (KRH) pending before the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court")) and, Buxbaum Holdings, Inc., d\b\a Buxbaum Group, California corporation, or its designee (the "Buyer").

This Agreement contemplates a transaction in which the Buyer will purchase certain of the Seller's General Intangible Assets (as said term is defined herein).

Unless otherwise defined herein, capitalized terms used in this Agreement shall have the meanings ascribed to them in Article VII.

In consideration of the representations, warranties and covenants herein contained, the Parties agree as follows.

## ARTICLE I
## THE ASSET PURCHASE

1.1     Purchase and Sale of Assets.

(a)     Upon and subject to the terms and conditions of this Agreement, the Buyer shall purchase from the Seller, and the Seller shall sell, transfer, convey, assign and deliver to the Buyer, at the Closing, for the consideration specified below in this Article I, all right, title and interest in, to and under the Acquired Assets, in all cases, free and clear of any Security Interest.

(b)     Notwithstanding the provisions of Section 1.1(a), the Acquired Assets shall not include the Excluded Assets.

1.2     [Reserved]

1.3     Purchase Price.

(a)     The purchase price (the "Purchase Price") for the Acquired Assets shall be $165,000.00.

(b)     The Purchase Price shall be made in cash by wire transfer or certified funds paid by Buyer to Seller at the Closing (the "Closing Payment").

1.4     The Closing.  The Closing shall take place no later than five (5) business days after the Bankruptcy Court Order approving this Agreement is entered and becomes final and non-appealable (the "Approval Order").  The exact date, time and location of the Closing shall be as agreed upon by the Buyer and Seller.  (the "Closing Date").  All transactions at the

Closing shall be deemed to take place simultaneously, and no transaction shall be deemed to have been completed and no documents or certificates shall be deemed to have been delivered until all other transactions are completed and all other documents and certificates are delivered, including, but not limited to, the Ancillary Agreements.

1.5     Further Assurances.  At any time and from time to time after the Closing, at the request of the Buyer or Seller, as applicable, and without further consideration, (a) the Seller shall execute, deliver and acknowledge or cause to be executed, delivered and acknowledged, such other documents or instruments of sale, transfer, conveyance and assignment and take such actions as the Buyer may reasonably request to more effectively transfer, convey and assign to the Buyer, and to confirm the Buyer's rights to, title in and ownership of, the Acquired Assets and to fully implement the purpose of this Agreement, and (b) the Buyer shall execute and deliver to the Seller such other instruments and certificates of assumption as Seller may reasonably request in order to effectively make the Buyer responsible for all Assumed Liabilities after the Closing.  Notwithstanding anything to the contrary herein, Seller's obligations under this Section are limited to actions which can be accomplished without expenditure of material cost.

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Buyer that, except as set forth in the Schedules hereto, the statements contained in this Article II are true and correct as of the date of this Agreement, except to the extent such representations and warranties are specifically made as of a particular date (in which case such representations and warranties are true and correct as of such date).  For the purposes of this Article II, any representation or warranty made by the Seller is made exclusively in relation to the Business and the Acquired Assets. Furthermore, notwithstanding anything contained herein to the contrary, the following representations and warranties shall not survive Closing.

2.1     Organization, Qualification and Corporate Power.  The Seller is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Virginia.  Except to the extent otherwise provided in the Bankruptcy Code, the Seller has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted.

2.2     Authorization of Transaction.  Subject to the issuance and entry of the Aproval Order, the Seller has the exclusive right, all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder.  The execution and delivery by the Seller of this Agreement and, the performance by the Seller of this Agreement and the Ancillary Agreements to which it is a party and the consummation by the Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of the Seller.  This Agreement has been duly and validly executed and delivered by the Seller and constitutes, and each of the Ancillary Agreements to which it is a party, upon its execution and delivery by the Seller and entry of the Approval Order by the Bankruptcy Court, will

constitute, a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

2.3 <u>Noncontravention</u>. Neither the execution and delivery by the Seller of this Agreement or the Ancillary Agreements to which they are a party, nor the consummation by the Seller of the transactions contemplated hereby or thereby, will (a) conflict with or violate any provision of the Articles of Incorporation of the Seller, (b) require on the part of the Seller any notice to or filing with, or any permit, authorization, consent or approval of, any Governmental Entity, other than the Bankruptcy Court, (c) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party the right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which the Seller is a party or by which the Seller is bound or to which any of its respective assets is subject, except for (i) any conflict, breach, default, acceleration, termination, modification or cancellation which, individually or in the aggregate, would not have a Seller Material Adverse Effect and would not adversely affect the consummation of the transactions contemplated hereby or (ii) any notice, consent or waiver the absence of which, individually or in the aggregate, would not have a Seller Material Adverse Effect and would not adversely affect the consummation of the transactions contemplated hereby, (d) result in the imposition of or acceleration of any Security Interest upon any assets of the Seller or (e) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Acquired Assets or the Business to the extent known to be binding upon or applicable to Seller or its assets.

2.4 <u>Tax Matters</u>. All Taxes shown to be due on the Tax Returns, including any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof above and in respect of the Acquired Assets have been paid in full. With respect to all amounts in respect of Taxes imposed upon the Seller or an Affiliate thereof, or for which the Seller or such Affiliate is or could be liable with respect to the Acquired Assets, whether to taxing authorities or to other persons or entities (as, for example, under tax allocation agreements), and with respect to all taxable periods or portions of periods ending on or before the Closing, all applicable Tax Laws and agreements have been fully complied with, and all such amounts required to be paid by the Seller or such Affiliate to taxing authorities or others have been paid, or to the extent such Taxes or amounts are not yet payable, will be duly and timely paid by the Seller or such Affiliate. The Seller has filed on a timely basis all Tax Returns that it was required to file prior to the date of this Agreement which relate to the Business, and all such Tax Returns were complete and accurate in all material respects and all Taxes shown thereon to be due and payable as of the date of this Agreement have been paid in full. Seller has not received notice of any tax deficiency outstanding, proposed or assessed against it, nor does Seller have any knowledge of any basis for any tax deficiency or assessment. There are no tax liens upon, pending against or, to the knowledge of Seller, threatened against any Acquired Assets. No examination or audit of any Tax Return of the Seller related to the Business by any Governmental Entity is currently in progress or, to the knowledge of the Seller, threatened or contemplated. The Seller has not been informed by any jurisdiction that the jurisdiction believes that the Seller was required to file any Tax Return that was not filed that related to the Business. The Seller has not waived any statute of limitations with respect to Taxes that relate to the Business or agreed to an extension of time with respect to a Tax assessment or

deficiency that relates to the Business. All Taxes that were required to be collected or withheld by the Seller or any Affiliate thereof with respect to the Acquired Assets and the Business have been duly collected or withheld, and all such amounts that were required to be remitted to any taxing authority have been duly remitted. No Tax is required to be withheld pursuant to Section 1445 of the Internal Revenue Code of 1986, as amended (collectively with the Treasury regulations promulgated under the Code), as a result of the transfer of the Acquired Assets contemplated hereby.

2.5 <u>Ownership and Condition of Assets</u>. The Seller has good title to all of the Acquired Assets free and clear of all Security Interests, except as set forth in <u>Schedule 2.5</u>. At Closing, the Buyer will become the true and lawful owner of, and will receive good title to, the Acquired Assets, free and clear of all Security Interests.

2.6 <u>Intellectual Property</u>. <u>Schedule 2.6</u> sets forth an accurate and complete list (identifying in each case the registered or other owner, registration number and expiration date, if any) of all Intellectual Property/Trademarks that are registered, or for which an application for registration is pending, with any Governmental Entity in the name of Seller (sometimes refereed to as "Intellectual Property" or "Trademarks"). Furthermore, Seller, represents and warrants to the Buyer that:

(a) [reserved]

(b) the only domain names owned by the Debtor are skmenswear.com; sktux.com; skformalwear.com; skcorporateapparel.com; skpersonalizedgifts.com; skprom.com; sktuxrental.com; sktuxedorental.com; skmenswear.co.uk.

(c) "customer information", as said term is utilized in the definition of Acquired Assets, is located on one database that is inclusive of customer's names, phone numbers, e-mail addresses, order history and other related data (approximately 5 million records). Such information can be compiled into one massive table.

(d) Except as set forth in <u>Schedule 2.6</u>, Seller is the sole and exclusive owner of the Intellectual Property, free and clear of all Security Interest. Seller has the sole and exclusive right to use the Intellectual Property and Trademarks in connection with the goods covered by the applicable Trademark registration;

(e) To the knowledge of Seller, all other items of Intellectual Property owned by Seller are properly registered under applicable laws where registered, and all such registrations are valid and in force, or in the case of applications, are pending and in good standing, all, to the knowledge of Seller, without challenge of any kind; and

(f) (i) To the knowledge of Seller, no action, suit, proceeding or investigation is pending nor has Seller received any notice of a threatened action or suit against Seller that asserts that the Intellectual Property interferes with, infringes upon, conflicts with or otherwise violates the rights of others; (ii) to the knowledge of Seller, Seller has not received any notice that the Intellectual Property (A) interferes with, infringes upon, conflicts with or otherwise violates the rights of others or (B) is being interfered with or infringed upon by others; (iii) there

4

are no royalty, commission or similar arrangements requiring any further payment by or to Seller or, to the knowledge of Seller, by or to Buyer as the successor in interest to Seller with respect to the Intellectual Property; (iv) Seller has not agreed to indemnify any Person for or against any infringement of or by the Intellectual Property; and (v) to the knowledge of Seller, there are no patents, patent applications, inventions or similar intellectual property which infringes upon any of the Intellectual Property or which renders obsolete or materially adversely affects the operations of the Business as conducted as of the date hereof.

(g)     The Seller has the exclusive right and authority to use and to license third parties the right to use the Trademarks in the United States in connection with the manufacture, sale and advertising of the goods covered by the applicable Trademark Registrations subject to Seller's existing license agreements.

(h)     With respect to the Trademarks, to the Seller's knowledge, no person or entity other than the Seller has any claim of ownership with respect thereto for use in connection with the goods covered by the applicable Trademark Registrations within the United States.

(i)     Except as set forth in Schedule 2.6(f), to the Seller's knowledge, no person or entity has asserted any Claim with respect to the Seller's use of any of the Intellectual Property included in the Acquired Assets.  Without limiting the generality of the foregoing, the Seller has not received notice of any claim that the Intellectual Property or the use of same within the United States conflicts with, or infringes upon, any rights of any third party (and, to the Seller's knowledge, there is no basis for any such claim or conflict).  The foregoing representation of the Seller is the only representation being made by Seller with respect to the Intellectual Property.

(j)     Except as otherwise set forth herein, the Seller shall retain, after the Closing, no right, title or interest in any trademark, or in any trademark or application registration which is confusingly similar to the Trademarks or Intellectual Property that are part of the Acquired Assets.

(k)     The Seller has no right, title or interest in or to any trademark application or registration with respect to the Trademarks other than the Intellectual Property.

2.7     Contracts.

(a)     Schedule 2.7 lists the following agreements to which the Seller is a party as of the date of this Agreement that relate to the Acquired Assets:

(i)     any license agreements with respect to Intellectual Property.

(b)     The Seller has delivered to the Buyer a complete and accurate copy of each agreement listed in Schedule 2.7.  With respect to each agreement so listed:  (i) the agreement is legal, valid, binding and enforceable and in full force and effect; (ii) for those agreements to which the Seller is a party, the agreement is assignable by the Seller to the Buyer without the consent or approval of any party and will continue to be legal, valid, binding and enforceable and in full force and effect immediately following the Closing in accordance with the terms thereof as in effect immediately prior to the Closing; and (iii) the Seller is not in breach

or violation of, or default under, any such agreement, and no event has occurred, is pending or, to the knowledge of the Seller, is threatened, which, after the giving of notice, with lapse of time, or otherwise, would constitute a breach or default by the Seller; and (iv) to Seller's knowledge, no other party to any such agreement is in breach thereof, and no party is paying liquidated damages in lieu of performance thereunder.

2.8 <u>Litigation</u>. Except as set forth on <u>Schedule 2.8</u>, there is no Legal Proceeding which is pending or has been threatened in writing against the Seller or which has been initiated by Seller related to the Acquired Assets which (a) seeks either damages or equitable relief, (b) in any manner challenges or seeks to prevent, enjoin, alter or delay the transactions contemplated by this Agreement, or (c) in any way affecting any of Seller's rights in, or the value of, the Acquired Assets. Seller has not received notice of any outstanding judgments, orders or decrees outstanding against the Seller.

2.9 <u>Legal Compliance</u>. The Seller possesses the Acquired Assets in compliance with each applicable law (including rules and regulations thereunder) of any federal, state, local or foreign government, or any Governmental Entity, except for any violations or defaults that, individually or in the aggregate, have not had and would not reasonably be expected to have a Seller Material Adverse Effect. The Seller has not received any notice or communication from any Governmental Entity alleging noncompliance with any applicable law, rule or regulation relating to the Acquired Assets.

2.10 <u>Brokers' Fees</u>. Except for amounts owed to Streambank LLC as authorized by the Bankruptcy Court, the Seller does not have any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

2.11 <u>Insurance</u>. The Acquired Assets are covered by policies of property loss, casualty and liability insurance. There are no claims against the Acquired Assets pending or, to the best knowledge of Seller, threatened under Seller's property loss, casualty or liability insurance policies, and no claim has been made thereunder during the three years preceding the date hereof. All premiums due and payable thereon have been paid, and all such policies are in full force and effect in accordance with their respective terms. Such policies are underwritten by financially sound and reputable insurers and constitute commercially reasonable insurance coverage in respect of Seller's past practice and companies similarly situated with Seller.

2.12 <u>Absence of Changes</u>. Except as set forth on <u>Schedule 2.16</u>, since June 26, 2009, Seller has conducted its Business as disclosed to the Bankruptcy Court and there has not been any of the following that have not been disclosed to the Bankruptcy Court:

(a) purchase, sale or disposition of any Acquired Asset other than inventory in the ordinary course of business;

(b) entry into any license agreement or termination of or amendment to any then existing license agreement related to the Acquired Assets;

(c)     modification, amendment, extension, renewal or termination of any Assigned Contract, or change in the standard terms of any warranty or service agreement relating to the Acquired Assets;

(d)     agreement in writing or otherwise to take, any of the actions described in clauses (a) through (c) above.

2.13     No Royalties or Other Consideration.  Except as set forth on Schedule 2.17, no royalties, fees or commissions are required or payable to any third party arising from Seller's use and enjoyment of the Trademarks and the other Acquired Assets.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer jointly and severally represents and warrants to the Seller that the statements contained in this Article III are true and correct as of the date of this Agreement and will be true and correct as to the Closing as though made as of the Closing.

3.1     Organization and Corporate Power.  The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California. The Buyer has all requisite corporate power and authority to carry on the businesses in which it is engaged and to own and use the properties owned and used by it.

3.2     Authorization of the Transaction.  The Buyer has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder.  The execution and delivery by the Buyer of this Agreement and the Ancillary Agreements and the consummation by the Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of the Buyer.  This Agreement has been duly and validly executed and delivered by the Buyer and constitutes a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms.

3.3     Noncontravention.  Neither the execution and delivery by the Buyer of this Agreement or the Ancillary Agreements, nor the consummation by the Buyer of the transactions contemplated hereby or thereby, will (a) conflict with or violate any provision of the Certificate of Incorporation or Bylaws of the Buyer, (b) require on the part of the Buyer any filing with, or permit, authorization, consent or approval of, any Governmental Entity, (c) conflict with, result in breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which the Buyer is a party or by which it is bound or to which any of its assets is subject, except for (i) any conflict, breach, default, acceleration, termination, modification or cancellation which would not adversely affect the consummation of the transactions contemplated hereby or (ii) any notice, consent or waiver the absence of which would not adversely affect the consummation of the transactions contemplated hereby, or (d) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Buyer or any of its properties or assets.

3.4    <u>Broker's Fees</u>.  The Buyer does not have any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.


ARTICLE IV
CONDITIONS TO CLOSING

4.1    <u>Conditions to Obligations of the Buyer</u>.  The obligation of the Buyer to consummate the transactions contemplated by this Agreement to be consummated at the Closing is subject to the satisfaction of the following additional conditions:

(a)    Richard Hardy, an employee of Seller, shall have executed such acknowledgments or assignments, in form and substance reasonably satisfactory to counsel for Buyer, as shall be deemed necessary in the reasonable judgment of counsel for Buyer to recognize and document Seller's ownership of the domain names included on <u>Schedule 2.6</u>.

(b)    The Seller shall deliver to Buyer a fully executed assignment to transfer each Trademark to Buyer in the form set forth in Exhibit B attached hereto and made a part hereof.

(c)    the representations and warranties of the Seller set forth in this Agreement that are qualified as to materiality shall be true and correct in all respects, and all other representations and warranties of the Seller set forth in this Agreement shall be true and correct in all material respects;

(d)    the Seller shall have performed or complied in all material respects with its agreements and covenants required to be performed or complied with under this Agreement as of or prior to the Closing;

(e)    Other than the Bankruptcy Proceeding, no Legal Proceeding shall be pending wherein an unfavorable judgment, order, decree, stipulation or injunction would (i) prevent consummation of the transactions contemplated by this Agreement, (ii) cause the transactions contemplated by this Agreement to be rescinded following consummation or (iii) affect adversely the right of the Buyer to own, operate or control any of the Acquired Assets, following the Closing, and no such judgment, order, decree, stipulation or injunction shall be in effect;

(f)    the Seller shall have delivered to the Buyer the Seller Certificate, the Seller's Secretary Certificate, and the Ancillary Agreements;

(g)    [Reserved];

(h)    [Reserved];

(i)    the Approval Order shall be in form that is satisfactory to Buyer; and

4.2     Conditions to Obligations of the Seller.   The obligation of the Seller to consummate the transactions contemplated by this Agreement to be consummated at the Closing is subject to the satisfaction of the following additional conditions (it being agreed that, unless otherwise agreed by the parties hereto, if any of the following conditions are not satisfied as of the Closing and the parties nevertheless consummate the transactions contemplated hereby, such conditions shall be deemed waived):

(a)     the Buyer shall pay to the Seller the Closing Payment, payable by wire transfer of immediately available funds to an account designated by the Seller;

(b)     the representations and warranties of the Buyer set forth in this Agreement that are qualified as to materiality shall be true and correct in all respects, and all other representations and warranties of the Buyer set forth in this Agreement shall be true and correct in all material respects;

(c)     the Buyer shall have performed or complied with in all material respects its agreements and covenants required to be performed or complied with under this Agreement as of or prior to the Closing;

(d)     no Legal Proceeding shall be pending or threatened wherein an unfavorable judgment, order, decree, stipulation or injunction would (i) prevent consummation of the transactions contemplated by this Agreement or (ii) cause the transactions contemplated by this Agreement to be rescinded following consummation, and no such judgment, order, decree, stipulation or injunction shall be in effect;

(e)     the Buyer shall have delivered to the Seller the Buyer Certificate, the Buyer Secretary's Certificate and the Ancillary Agreements; and

(f)     entry by the Bankruptcy Court of the Approval Order in form that is satisfactory to Seller.

## ARTICLE V
## POST-CLOSING COVENANTS

5.1     Forwarding of Assets and Correspondence.   Seller agrees that it will, forthwith after receipt, transfer and deliver to Buyer any cash or property that Seller may receive in respect of any of the Acquired Assets and any mail or other documents received by Seller relating to any of the Acquired Assets transferred to Buyer hereunder, such property, mail and documents to be delivered in the form and condition in which received, except for the opening of any envelope or package, and the endorsement of any instrument for collection, if required.

5.2     No Use of Trademarks.   After the Closing, the Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly, use or utilize in any manner whatsoever, the Trademarks or any similar trademarks or names, logos, designs or graphics.

5.3     No Attacks on Validity of Trademarks.   After the Closing, the Seller shall not, and shall cause each of its Affiliates not to, under any circumstances attack or question the

validity of, or assist any third party in attacking or questioning the rights hereafter claimed by the Buyer, in the Trademarks and the other Acquired Assets.

5.4 <u>Privacy Policy.</u> The Buyer shall only use consumer records for the same purpose(s) as are specified in the Privacy Policy. The Buyer shall comply with the Privacy Policy and its specified policies and practices. Prior to making any "material change" to the Privacy Policy, or the use or disclosure of personal information different from that specified in the Privacy Policy, the Buyer shall notify all consumers and offer them an opportunity to "opt out" of the changes to those policies or the new uses of their personal information. Notwithstanding the foregoing, when delivering the initial "opt out" opportunity, the Buyer may simultaneously provide information with respect to the Buyer and its affiliates, including product advertisement and promotion The Buyer shall employ appropriate information controls and procedures (technical, operational and managerial) to protect the personally identifiable consumer information. The Buyer shall abide my any applicable state privacy and data breach law.

ARTICLE VI
<u>INDEMNIFICATION</u>

[Reserved]

ARTICLE VII
DEFINITIONS

For purposes of this Agreement, each of the following terms shall have the meaning set forth below.

"<u>Acquired Assets</u>" shall mean all of the right, title and interest of Seller in and to all the following assets, free of all Security Interest, wherever located, whether now owned or acquired on or after the date hereof but prior to the Closing, whether tangible or intangible (including, without limitation, goodwill) (provided, however, that Acquired Assets shall in no event include any of the Excluded Assets):

(a) all right, title and interest of Seller in all Intellectual Property (including without limitation tradenames, trademarks, copyrights, brand names, patents, mailing lists, websites, website design and related website assets, domain names, URL's, linkages, etc.), together with the goodwill therein and related thereto and all rights, privileges, claims, causes of action and options relating or pertaining to such Intellectual Property, including the right to sue for past and future infringements of such Intellectual Property. In connection with the foregoing, the Seller has represented that the only brand names owned by the Seller are as listed on Schedule 2.6. Further, the Seller has represented that the only domain names are skmenswear.com; sktux.com; skformalwear.com; skcorporateapparel.com; skpersonalizedgifts.com; skprom.com; sktuxrental.com; sktuxedorental.com; skmenswear.co.uk. and

(b)     all customer information related property (including, without limitation, customer lists, mailing lists and customer databases) in readily accessible, readable and usable formats.  The Seller has represented that "customer information" is located on one database that is inclusive of customer's names, phone numbers, e-mail addresses, order history and other related data.  Further, the Seller has represented that such information can be compiled into one massive table.

"Affiliate" shall mean, with respect to any party hereto, any person or entity that directly, or indirectly through one of more intermediaries, controls or is controlled by or is under common control with such party.

"Ancillary Agreements" shall mean the Bill of Sale and Assignment Agreement, Trademark Assignment, Domain Name Assignment and all other instruments of conveyance, and all instruments of assumption and other agreements and instruments executed by the parties in connection with this Agreement.

"Bill of Sale and Assignment Agreement" shall mean a Bill of Sale and Assignment Agreement substantially in the form set forth in Exhibit A attached hereto and made a part hereof.

"Business" shall mean the Debtor's operations of menswear retail stores and related activities.

"Buyer" shall have the meaning set forth in the first paragraph of this Agreement.

"Buyer Certificate" shall mean a certificate, signed by an authorized officer of Buyer, to the effect that each of the conditions specified in clauses (a) through (d) (insofar as clause (d) relates to Legal Proceedings involving the Buyer) and (f) of Section 4.2 is satisfied in all respects.

"Buyer Secretary's Certificate" shall be a certificate by the Buyer's secretary or assistant secretary (i) certifying the Buyer's certificate of formation, and good standing, (ii) certifying the approval of the execution of this Agreement by the Buyer's Manager, and (iii) certifying the authority of the officer(s) of Buyer executing this Agreement.

"Closing" shall mean the closing of the transactions contemplated by this Agreement.

"Closing Date" shall mean the date of the satisfaction or waiver of all of the conditions to the obligations of the Parties to consummate the transactions contemplated hereby (excluding the delivery at the Closing of any of the documents set forth in Article V). The Parties shall use reasonable commercial efforts to complete Closing on the date set forth in Section 1.5 hereof, or such other date as may be mutually agreeable to the Parties.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Domain Name Assignment" shall mean a Domain Name Assignment substantially in the form set forth in Exhibit C attached hereto and made a part hereof.

"Excluded Assets" shall mean all assets of Seller other than the Acquired Assets.

"Governmental Entity" shall mean any court, arbitrational tribunal, administrative agency or commission or other governmental or regulatory authority or agency.

"Intellectual Property" shall mean, throughout the world, the tradenames and trademarks and registrations related thereto, all trade secrets, licenses, patterns, designs, archive documents, pressbooks, promotional material, artwork, know-how, patents, patent applications, copyrights, copyright applications, copyright registrations; Web sites, including the content contained therein, domain names, domain name registrations, designs, formula, invention, or other intangible asset of any nature (whether in use, operational, active, under development or design, non-operative, or inactive, owned, marketed, maintained, supported, used, licensed or otherwise held for use by, or licensed to or with respect to which rights are granted to a Person), and all goodwill, whether or not related to the foregoing, whether arising under statutory or common law in any jurisdiction or otherwise.

"Legal Proceeding" shall mean any action, suit, proceeding, claim, arbitration or investigation before any Governmental Entity or before any arbitrator.

"Parties" shall mean the Buyer and the Seller.

"Privacy Policy" shall mean the consumer privacy policy attached hereto as Schedule 5.4.

"Purchase Price" shall mean the purchase price to be paid by the Buyer for the Acquired Assets at the Closing, as set forth in Section 1.3.

"Schedule(s)" shall mean the disclosure schedule provided by the Seller to the Buyer on the date hereof, attached to this Agreement and made a binding part hereof.

"Security Interest" shall mean any mortgage, pledge, security interest, encumbrance, charge or other lien (whether arising by contract or by operation of law).

"Seller" shall have the meaning set forth in the first paragraph of this Agreement.

"Seller Certificate" shall mean a certificate, signed by an authorized officer of the Seller, to the effect that each of the conditions specified in clauses (a) through (d) (insofar as clause (d) relates to Legal Proceedings involving the Seller) of Section 4.2 is satisfied in all respects.

"Seller Secretary's Certificate" shall be a certificate by the Seller's secretary or assistant secretary (i) certifying the Seller's articles of incorporation and good standing, (ii) certifying the approval of the execution of this Agreement by Seller's Board of Directors and Shareholders, and (iii) certifying the authority of the officer(s) of Seller executing this Agreement.

"Taxes" shall mean all taxes, charges, fees, levies or other similar assessments or liabilities, including income, gross receipts, ad valorem, premium, value-added, excise, real property, personal property, sales, use, transfer, withholding, employment, unemployment, insurance, social security, business license, business organization, environmental, workers compensation, payroll, profits, license, lease, service, service use, severance, stamp, occupation, windfall profits, customs, duties, franchise and other taxes imposed by the United States of America or any state, local or foreign government, or any agency thereof, or other political

subdivision of the United States or any such government, and any interest, fines, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any tax or any contest or dispute thereof.

"Tax Returns" shall mean all reports, returns, declarations, statements or other information required to be supplied to a taxing authority in connection with Taxes.

"Trademarks" shall mean those trademark registrations issued by, and those applications for registration made to, the United States Patent and Trademark Office set forth on Schedule 2.6.

"Trademark Assignment" shall mean a Trademark Assignment substantially in the form set forth in Exhibit B attached hereto and made a part hereof.

ARTICLE VIII
MISCELLANEOUS

8.1     Press Releases and Announcements.  Neither Party shall issue any press release relating to the subject matter of this Agreement without the prior written approval of the other Party.

8.2     No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns.

8.3     Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, with respect to the subject matter hereof.

8.4     Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. Neither Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; provided that the Buyer may assign its rights, interests and/or obligations hereunder to an affiliate of the Buyer provided that such an affiliate expressly assumes the obligations of the Buyer hereunder and the Buyer guarantees the prompt payment and performance of such affiliate's obligations in connection herewith and with any Ancillary Agreements, in each case by way of agreements in form and substance reasonably satisfactory to the Seller.

8.5     Counterparts and Facsimile Signature.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement may be executed by facsimile signature.

8.6     Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

8.7     Notices.  All notices and other communications to be given to any party hereunder shall be sufficiently given for all purposes hereunder (i) when received, if in writing and delivered by hand, (ii) two (2) Business Days following deposit with a nationally recognized courier or overnight delivery service, (iii) three (3) days after being mailed by certified or registered mail, return receipt requested, with appropriate postage prepaid, or (iv) when sent, if sent in the form of a telegram or facsimile if receipt thereof is confirmed by telephone and a copy of such facsimile with proof of confirmation mailed via regular U.S. postal service to the address below; in each case directed to the address set forth below (or at such other address or facsimile number as such party shall designate by like notice):

If to Seller:
Jonathan M. Tibus, Chief Restructuring Officer
S & K Famous Brands, Inc.
c/o Tavenner & Beran, PLC
20 N. 8th Street
Richmond, VA  23219


If to Buyer:

Buxbaum Group
28720 Canwood Street, Suite 108
Agoura Hills, CA 91301

8.8     Governing Law.  This Agreement shall be governed by and construed (both as to validity and performance and enforced) in accordance with the internal laws of the Commonwealth of Virginia applicable to contracts to be performed entirely within that state, without giving effect to any principles of conflicts of law.

8.9     Amendments and Waivers.  The Parties may mutually amend any provision of this Agreement at any time prior to the Closing.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the Parties. No waiver by either Party of any right or remedy hereunder shall be valid unless the same shall be in writing and signed by the Party giving such waiver.  No waiver by either Party with respect to any default, misrepresentation, or breach of warranty or covenant hereunder shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

8.10     Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision

that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

8.11     <u>Attorney Fees/Expenses</u>.     Each Party shall bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.  .  In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

8.12     <u>Construction</u>.

(a)     The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against either Party.

(b)     Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(c)     Any reference to any Article, Section or paragraph shall be deemed to refer to an Article, Section or paragraph of this Agreement, unless the context clearly indicates otherwise.

8.13     <u>Specific Performance</u>.   The parties agree that (i) irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to obtain specific performance of the terms hereof, in addition to any other remedy at law or equity, and (ii) that the party seeking to specifically perform the terms hereof shall be entitled to recover reasonable attorneys fees if successful.

8.14     <u>Bidding Procedures/Bankruptcy Matters.</u>     Subject to Bankruptcy Court approval, in consideration of Buyer conducting its due diligence and entering into this Agreement, which serves as a base by with other offers may be measured and is subject to higher and better offers by way of a bidding process, all subject to the approval of the Bankruptcy Court and as more fully set forth in the motion to approve this Agreement, Seller agrees to pay Buyer for the proceeds of the offer received from the successful bidder (to the extent that Buyer is not the successful bidder) a break up fee in the amount of $10,000 (the "Break Up Fee").  In addition, any procedures for solicitation of higher and better offers to act as Buyer hereunder, shall require that such initial competing bid to be not less than $185,000.

8.15  Certain Trademarks.   Notwithstanding anything else contained in this Agreement, Seller has advised Buyer that the registrations for (i) FENZIA (Reg. No. 1,739,086), (ii) S&K AMERICA'S SUIT STORE & design (Reg. No. 2,274,126 and (iii) S&K AMERICA'S SUIT STORE (Reg/ No. 2,255,194) may have lapsed.  Buyer hereby expressly acknowledges and agrees that the transfer of these three marks shall be on an as is, where is basis and without any representation or warranty thereto that is or would be affected by such lapse.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

"SELLER"

S&K Famous Brands, Inc.,
a Virginia corporation

By:_____
Name:_____
Title:_____


"BUYER"

Buxbaum Holdings, Inc., d\b\a Buxbaum Group
a California corporation

By:_____
Name: Scott Rusczyk
Title: Vice President

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

"SELLER"

S&K Famous Brands, Inc.,
a Virginia corporation

By:_____
Name:_____
Title:_____


"BUYER"

Buxbaum Holdings, Inc., d\b\a Buxbaum Group
a California corporation

By:_____
Name: Scott Rusczyk
Title: Vice President

**EXHIBIT A**
**BILL OF SALE AND ASSUMPTION AGREEMENT**

# GENERAL CONVEYANCE, ASSIGNMENT AND BILL OF SALE

THIS GENERAL CONVEYANCE, ASSIGNMENT AND BILL OF SALE (this "Agreement") is made and entered into on _____, 2009, by and among _____, a _____ ("Seller") and _____, a _____ ("Buyer").

## WITNESSETH:

WHEREAS, Buyer and Seller have entered into an Asset Purchase Agreement dated as of _____, 2009 (the "Purchase Agreement"), whereby Buyer will acquire certain assets related to Seller's business;

WHEREAS, pursuant to the Purchase Agreement, Seller and Buyer are required to execute and deliver this Agreement in connection with the consummation of the transactions contemplated by the Purchase Agreement;

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## TRANSFER OF ASSETS

1.1     <u>Transfer of Acquired Assets</u>.  Effective as of the date hereof and subject to the terms and conditions of the Purchase Agreement, Seller hereby sells, assigns, transfers, grants, conveys, bargains and delivers unto Buyer and its successors and assigns, free and clear of all Security Interests, all right, title and interest in, to and under the Acquired Assets; TO HAVE AND TO HOLD the Acquired Assets unto Buyer and its successors and assigns forever, together with all and singular the rights and appurtenances belonging or pertaining thereto.

1.2     <u>Purchase Price for Acquired Assets</u>.  In consideration of the transfer by Seller to Buyer of the Acquired Assets, Buyer shall pay or deliver, or cause to be paid or delivered, to Seller the Purchase Price.

## ARTICLE 2
## ADDITIONAL AGREEMENTS

Seller covenants and agrees to, from time to time hereafter and without further consideration, execute, acknowledge and deliver or cause to be executed, acknowledged and delivered to Buyer such bills of sale, assignments and other instruments of transfer, assignment and conveyance, in form and substance reasonably satisfactory to counsel for Buyer, as shall be necessary to vest in Buyer all legal, record and beneficial right, title and interest in and to the Acquired Assets free and clear of all Security Interests (including the release of all Security Interests of record, if any) and shall use its commercially reasonable efforts to cause to be taken such other action as Buyer reasonably may require to more effectively implement and carry into effect the transactions contemplated by the Purchase Agreement and this Agreement.

# ARTICLE 3
## MISCELLANEOUS

3.1     <u>Conflict and Merger with Purchase Agreement</u>.  To the extent any conflict or inconsistency exists between the provisions of this Agreement and the Purchase Agreement, the provisions of the Purchase Agreement shall be controlling.  The terms and provisions of the Purchase Agreement (including without limitation the representations, warranties and covenants therein) shall not merge, be extinguished or otherwise be affected by the delivery and execution of this Agreement or any other document delivered pursuant to this Agreement.

3.2     <u>Applicable Law</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED (BOTH AS TO VALIDITY AND PERFORMANCE AND ENFORCED) IN ACCORDANCE WITH THE INTERNAL LAWS OF THE COMMONWEALTH OF VIRGINIA APPLICABLE TO CONTRACTS TO BE PERFORMED ENTIRELY WITHIN THAT STATE, WITHOUT GIVING EFFECT TO ANY PRINCIPLES OF CONFLICTS OF LAW.

3.3     <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and assigns.

3.4     <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

3.5     <u>Headings and Recitals</u>.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

3.6     <u>Capitalized Terms</u>.  Any capitalized terms used herein, but not otherwise defined herein, have the meanings assigned to such terms in the Purchase Agreement.

3.7     <u>Counterparts and Facsimile Signature</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement may be executed by facsimile signature.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

**SELLER:**

[name]

By: _____
Name:
Title:

**BUYER:**

[name]

By: _____
Name:
Title:

# EXHIBIT B
# TRADEMARK ASSIGNMENT

# TRADEMARK ASSIGNMENT

WHEREAS, _____, a

_____ organized under the laws of the State of _____, having a place of

business at _____, United States of America

("Assignor"), owns the following marks which are registered in the United States Patent and

Trademark Office, (the "Marks"):

| Mark | Registration Date | Registration Number |
|------|-------------------|---------------------|
| CAMBRIDGE BAY | 3/17/1987 | 1,433,036 |
| CAMBRIDGE BAY | 4/20/1993 | 1,765,957 |
| CLUB RUN EXECUTIVE | 3/5/1991 | 1,636,984 |
| CLUB RUN SHIRTMAKERS | 4/2/1991 | 1,639,815 |
| DANIEL GRAY MENSWEAR | 3/25/2003 | 2,701,305 |
| GIO BRASSERO | 4/17/1990 | 1,592,116 |
| GLENCARLYN | 4/10/1990 | 1,591,041 |
| KILBURNE AND FINCH | 1/17/2006 | 3,045,933 |
| KILBURNE AND FINCH stylized | 7/9/1985 | 1,348,160 |
| ROBERTO VILLINI | 4/22/1997 | 2,056,065 |
| S&K | 4/17/2007 | 3,228,977 |
| S&K FAMOUS BRANDS | 9/16/1997 | 2,096,201 |

| | | |
|---|---|---|
| TAILORS ROW | 9/10/1991 | 1,656,855 |
| TAILORS ROW | 2/16/1993 | 1,753,302 |
| TAILORS ROW | 1/24/1995 | 1,875,326 |
| TAILORS ROW | 4/27/1993 | 1,768,125 |
| TAILORS ROW | 10/13/1992 | 1,724,782 |
| FENZIA | 12/8/1992 | 1,739,086 |
| S&K AMERICA'S SUIT STORE & design | 8/31/1992 | 2,274,1260 |
| S&K AMERICA'S SUIT STORE | 6/22/1999 | 2,255,194 |

WHEREAS, _____, a corporation organized under the laws of the State of _____, having a place of business at _____, United States of America ("Assignee"), desires to acquire the Marks and the registrations thereof;

NOW THEREFORE, for all good and valuable consideration, receipt of which is hereby acknowledged, Assignor hereby assigns unto Assignee all rights, title and interest in and to the Marks, together with the goodwill of the business symbolized by the Marks, and the registrations thereof free and clear of all liens, security interests, encumbrances and claims of any kind.

_____

By: _____
    Name:
    Title:

_____ ___, 2009

**EXHIBIT C**
**DOMAIN NAME ASSIGNMENT**

# DOMAIN NAME ASSIGNMENT AGREEMENT

WHEREAS, _____, a corporation organized under the laws of _____("Assignor"), has registered the following Internet domain names:

| | |
|---|---|
| skmenswear.com; sktux.com; | skprom.com; sktuxrental.com; |
| skformalwear.com; | sktuxedorental.com; |
| skcorporateapparel.com; | skmenswear.co.uk. |
| skpersonalizedgifts.com; | |

(collectively referred to the "Domain Names") with _____ (the "Registrations") and is the present owner of said Domain Names and Registrations;

WHEREAS, _____, a _____ corporation ("Assignee"), desires to acquire said Domain Names and Registrations;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignor assigns all right, title and interest in and to the Domain Names and the Registrations;

2. Assignor shall promptly execute this Agreement and execute any other documents necessary to effectuate and confirm the assignment, as well as perform any acts necessary to effect the transfer of the Domain Names and the Registrations to Assignee, including but not limited to instructing _____, to transfer the Domain Names to Assignee;

3. Effective upon transfer of the Domain Names and Registrations, Assignor shall cease use of the Domain Names to link to any Web site or email address; and

4. Upon transfer of the Domain Names and Registrations, Assignor shall bear no responsibility for the continued maintenance, including renewal, of the Domain Names and Registrations.

Dated: _____, 2009                _____

                                        By: _____

                                        Its: _____

**SCHEDULE 2.5**

**NONE**

**SCHEDULE 2.6**

| TMARK | APPNO | REGNO | STATUS | Reg. Date | Goods/Services |
|-------|-------|-------|--------|-----------|----------------|
| CAMBRIDGE BAY | 73/615,804 | 1,433,036 | REGISTERED | 3/17/1987 | Class 25: Sweaters and knit shirts |
| CAMBRIDGE BAY | 74/261,489 | 1,765,957 | REGISTERED | 4/20/1993 | Class 25: Sportcoats, slacks and woven sport shirts |
| CLUB RUN EXECUTIVE | 74/061,023 | 1,636,984 | REGISTERED | 3/5/1991 | Class 25: Clothing, namely dress shirts, knit shirts, sport shirts and neckties |
| CLUB RUN SHIRTMAKERS | 74/061,009 | 1,639,815 | REGISTERED | 4/2/1991 | Class 25: Clothing, namely dress shirts, knit shirts and sport shirts |
| DANIEL GRAY MENSWEAR | 76/320,880 | 2,701,305 | REGISTERED | 3/25/2003 | Class 25: Articles of clothing for men, namely suits, sportcoats, trousers, dress shirts, neckwear, blazers, tuxedos, raincoats, topcoats, sweaters, and sport shirts |
| FENZIA | 74/150,015 | 1,739,086 | REGISTERED | 12/8/1992 | Class 25: Men's suits, jackets, outer coats and slacks |
| GIO BRASSERO | 73/821,476 | 1,592,116 | REGISTERED | 4/17/1990 | Class 25: Men's suits, sport coats, jackets, neckties, woven sportshirts, knitted shirts and sweaters |
| GLENCARLYN | 73/821,480 | 1,591,041 | REGISTERED | 4/10/1990 | Class 25: Men's sport coats and suits |
| KILBURNE AND FINCH | 78/525,102 | 3,045,933 | REGISTERED | 1/17/2006 | Class 25: Clothing and accessories, namely, suits, sport coats, slacks, dress shirts, sport shirts, and ties. |
| KILBURNE AND FINCH stylized | 73/514,199 | 1,348,160 | REGISTERED | 7/9/1985 | Class 25: Men's suits |
| ROBERTO VILLINI | 74/672,722 | 2,056,065 | REGISTERED | 4/22/1997 | Class 25: Clothing; namely, suits, sport coats, topcoats, raincoats, ties, slacks, sport shirts, dress shirts, sweaters, belts and hosiery |
| S&K | 76/614,371 | 3,228,977 | REGISTERED | 4/17/2007 | Class 35: Retail store services in the field of men's clothing |
| S&K FAMOUS BRANDS | 74/289,505 | 2,096,201 | REGISTERED | 9/16/1997 | Class 42: Retail store services in the field of men's clothing |
| S&K AMERICA'S SUIT STORE and design | 75/498,602 | 2,274,160 | REGISTERED | 8/31/1999 | Class 35: Retail store services featuring men's clothing |
| S&K AMERICA'S SUIT STORE | 75/424,982 | 2,255,194 | REGISTERED | 6/22/1999 | Class 35: Retail store services featuring men's clothing |
| TAILORS ROW | 74/004,807 | 1,656,855 | REGISTERED | 9/10/1991 | Class 25: Men's suits, sport coats and slacks |
| TAILORS ROW | 74/800,914 | 1,753,302 | REGISTERED | 2/16/1993 | Class 25: Men's neckties |
| TAILORS ROW | 74/453,500 | 1,875,326 | REGISTERED | 1/24/1995 | Class 25: Men's topcoats and raincoats |

| | | | | | |
|---|---|---|---|---|---|
| TAILORS ROW | 74/801,093 | 1,768,125 | REGISTERED | 4/27/1993 | Class 25: Men's shirts |
| TAILORS ROW | 74/192,253 | 1,724,782 | REGISTERED | 10/13/1992 | Class 42: Retail store services in the field of men's clothing |

**SCHEDULE 2.7**

**NONE**

# SCHEDULE 2.8

**NONE**

**SCHEDULE 2.16**

**NONE**

**SCHEDULE 2.17**

**NONE**

**SCHEDULE 5.4**

# S&K Famous Brands – Privacy Policy

Securing Your Online Order
Protecting your order information is our first priority. S&K uses Secure Sockets layer (SSL) technology to protect your online order and credit information.
When you order merchandise from S&K Menswear, SSL encrypts your personal information including your name, address, and credit card information. With this encryption, only S&K is allowed to decode your information.

When you are browsing our Order Pages, you can verify that your connection is secure by checking for a graphic and security statement we place on the left side of each secure page.

Protecting Your Privacy
S&K Menswear respects your right to privacy. The information you provide is used to support your relationship with us. Among other things, we want to help you quickly find information on skmenswear.com, easily make purchases, and alert you to special offers, updated information and other new merchandise and services from S&K.

The personal information you provide and information about your order may be shared with third parties. This information may be combined with other personally identifiable information (such as demographic information and past purchase information) available from our records and other sources, but will not be used by third parties for marketing purposes. This information will be used to make our future marketing efforts more efficient. S&K Menswear will not share your email address with third party vendors unless otherwise stated.

When you visit our web site, some information such as your Internet address, Internet Service Provider, operating system, the site from which you linked, and the time and date of your visit and purchases may be collected automatically as part of the software operation of the site. We use this information to compile aggregate statistics such as the total number of daily visitors to our site, the pages most frequently visited, and how long people stay at each page. This allows us to understand our customers' needs and to develop products and services to serve those needs.

Skmenswear.com uses cookies to store your shopping cart items while you browse our online store. No personal or private information is stored during your visit in cookies.

We may also disclose information in the good faith belief that we are required to do so by law, or that doing so is reasonably necessary to comply with legal process, respond to claims, or protect the rights, property and personal safety of S&K Famous Brands, Inc., our customers, or the public.

S&K Menswear reserves the right to modify this privacy policy at any time, but will alert you that changes have been made by identifying the date the privacy policy was last updated. Policy Updated October 29, 2007.